JAMES FORRESTER AND ANO., APPELLANTS, v. BOSTON
& MONTANA CONSOLIDATED COPPER AND
SILVER MINING COMPANY, ET
AL., RESPONDENTS.

[Submitted Sept. 28, 1898. Decided Nov. 28, 1898.]

*Corporations—Disposition of Assets—Consent of Stockholders
—Remedy — Injunction — Preliminary Order — Laches —
Waiver—Mining.*

1. The directors of a corporation organized another corporation in another state, and
transferred the entire property of the former to it, in consideration of the second
corporation delivering its entire stock to the former, and assuming its liabilities.
Having obtained the consent of the holders of more than three-fourths of the stock
of the first corporation to such transfer, they executed another conveyance, in con-
firmation of the first, and delivered possession to the new company. They then ob-
tained an irrevocable power of attorney from the holders of three-fourths of the
stock, authorizing such stock to be voted in favor of a ratification of the transfer,
called a stockholders' meeting to ratify such transfer, and a protest against it by mi-
nority stockholders was disregarded. *Held,* that minority stockholders were entitled
to enjoin ratification of the transfer without proof that they had without avail ex-
hausted their remedies within the corporation.

2. The ratification by a majority of the stockholders of an illegal and incomplete trans-
fer of the corporate property may be enjoined by stockholders who acquired their
stock after such transfer was made.

3. The determination of questions of fact on motion for preliminary injunction will not
be disturbed on appeal, unless clearly against the evidence.

4. The fact that minority stockholders of a corporation waited until the day preceding
the time set for the ratification by a majority of the stockholders of an illegal and in-
complete transfer of the corporate property before suing for injunction was not
*laches.*

5. Nor was it a waiver of their rights.

6. An injunction *pendente lite* to restrain majority stockholders of a corporation from
ratifying an illegal transfer of the corporate property, and one that is *ultra vires,*
made by the officers and directors, will not be refused because the corporation offers
a bond; since a stockholder is entitled to restrain the illegal transfer of the corporate
assets as of right.

7. At common law the directors or a majority of the stockholders of a prosperous cor-
poration able to achieve the objects of its creation cannot sell or otherwise dispose
of all the property without the consent of all the stockholders.

8. Compiled Statutes 1887, Div. 5, Secs. 492-494, providing that the officers of a mining
corporation shall have no power "to sell * * * or otherwise dispose of" the whole
or part of its mining grounds, mills and plant, without such transfer being first ap-
proved by the holders of two-thirds of the stock, at a meeting at which at least three-
fourths of the stock is represented, and that, if such sale be of the entire corporate
property, the corporation shall be dissolved, is merely a limitation of the common-
law powers of directors and majority stockholders of corporations, and does not
authorize two-thirds of the stockholders of a prosperous corporation to sell all of its
property against the protest of any other stockholder.

9. Conceding that said provisions enable a prosperous corporation to sell all its property

without the unanimous consent of the stockholders, they do not authorize either a disposal thereof without a pecuniary consideration, or an exchange,

10. A transfer of all the property of a corporation to a foreign corporation organized by the directors of the former to acquire its property, in consideration of the latter assuming the liabilities of the former, and agreeing to deliver to it its entire capital stock, stockholders of the former to exchange their stock for shares in the new corporation, or in lieu thereof to receive a fixed sum per share for surrendering them, is neither a sale nor an exchange, within said provisions, conceding a sale or exchange to be authorized thereby.

*Appeal from District Court, Silver Bow County; William Clancy, Judge.*

ACTION by James Forrester and another against the Boston & Montana Consolidated Copper and Silver Mining Company and others for injunction. From an order granting an injunction *pendente lite*, defendants appeal. Affirmed.

Statement of the case by the justice delivering the opinion.

Appeal by defendants from an order granting a temporary injunction restraining them from voting, or allowing to be voted, any of the capital stock of the Boston & Montana Consolidated Copper and Silver Mining Company, of Montana, in favor of disposing of the property of the said corporation to a corporation of the same name organized under the laws of New York, and from ratifying or adopting any deed of conveyance of the said property theretofore made in the name of the Montana corporation to the New York corporation, or any act of the board of directors with reference to such transfers. This action was brought by plaintiffs in their own behalf, as well as in behalf of such other stockholders of the Montana corporation as are similarly situated, and desire to join them.

From the record we gather the following facts: The Boston & Montana Consolidated Copper and Silver Mining Company (hereinafter called the "Montana Company") was organized under the laws of Montana, in 1887, as a mining and smelting corporation. It has a capital stock of 150,000 shares of the par value of $25 each. The business in which it is engaged has been successfully carried on, its net income for 1897

being in excess of $3,000,000, of which $1,800,000 were distributed among the shareholders.    Its property is valued at $30,000,000, and its debts are insignificant in amount.   The stockholders number 1,877, and of these but a very few reside in Montana, the great majority living in the eastern states and in Europe.    While the practical mining and smelting operations have been conducted in Montana, the financial business of the company has been transacted in New York and Massachusetts, as the only markets for its product are in those states. The directors have always resided there, and it is inconvenient for them to hold frequent meetings in Montana.    It is also impracticable for the stockholders to attend meetings which are required to be held in this state.   The statute requires the transfer books to be kept in Montana.   For many years the stock of the company has been daily bought and sold in Boston and New York, and, unless the transfers are entered upon the books of the company, they are, for some purposes, invalid.    The directors, on April 5, 1898, caused to be incorporated, under the laws of New York, the Boston & Montana Consolidated Copper and Silver Mining Company, of New York, with the same capital stock as that possessed by the Montana company, divided into the same number of shares, and of a like par value; and on April 6, 1898, the directors of the Montana company executed, in the name of the company, a conveyance to the New York company of all the property owned by the Montana company, the consideration expressed being the assumption by the New York company of all the liabilities of the Montana company, and the delivery by the New York company of its entire capital stock to the Montana company, to be exchanged for stock held in the Montana company by those holding shares therein, share for share; or, at the option of the stockholders, the New York company was to pay such of them as did not transfer their shares for stock of the new company the sum of $130 a share.   On May 31, 1898, the directors, having obtained the written consent of those owning 131,036 shares of the Montana company, executed and delivered a like conveyance to the New York com-

pany in confirmation of the deed first executed, the considerations being the same as those inducing the transfer of April 6th, with the exception that the New York company agreed to pay $170 instead of $130 for each share not exchanged.

The New York corporation is in possession of the property attempted to be transferred.  On April 6, 1898, the directors of the Montana company mailed to each of the stockholders a copy of a notice calling for a meeting of the stockholders on June 6, 1898, in Butte, Mont., for the purpose of acting upon the proposition to sell all the assets of the Montana company, and for the purpose of ratifying or rejecting the action of the directors in disposing of the property of the corporation. The notice was also duly published in a newspaper for six weeks prior to June 6, 1898.

The plaintiff Forrester, on April 8, 1898, purchased 100 shares of the stock of the Montana company; and on May 16, 1898, the plaintiff Maginnis purchased a like number of shares. Neither the former owners of these shares so purchased, nor the plaintiffs, in any wise consented to the transfers made by the directors in the name of the Montana company.   Two days before the meeting called by the notice, plaintiffs, having served a formal protest against the attempted transfer and its intended ratification, brought this action.

On June 6, 1898, the stockholders convened and organized. There were presented at the meeting, by certain of the individual defendants, proxies from the holders of 131,036 shares of the capital stock, authorizing the holders of the proxies to vote in favor of the ratification of the transfer theretofore made to the New York company.

Upon the hearing of the order to show cause why an injunction *pendente lite* should not issue, the defendants offered a bond in the penal sum of $50,000, conditioned, in substance, that if the defendants shall, when requested by plaintiffs, purchase from them the 200 shares mentioned at the market price thereof, and pay any damages that might be sustained by them because of any action that may be taken at the meeting of the stockholders of the Montana company pursuant to the notice

heretofore referred to, the obligation should be void, but otherwise to be in force. The defendants further offered to execute a bond in such form, or with such conditions, in such amount, and with such sureties, as the court might designate, in lieu of the bond so offered, if it were deemed in any wise insufficient. The court declined to accept such bond, and granted the injunction order appealed from.

*John F. Forbis, Louis Marshall* and *Wm. H. De Witt,* for Appellants.

*Robert B. Smith, J. J. McHatton* and *Clayberg & Corbett,* for Respondents.

PIGOTT, J.—We shall discuss briefly such of the points made by the defendants as seem worthy of serious attention.

1. Defendants argue that the failure of plaintiffs to state and prove that they have exhausted their remedies within the corporation is fatal to the maintenance of the action. The point is without merit. Sufficient appears to show, with reasonable certainty, that plaintiffs could not hope to obtain within the corporation itself redress of their alleged grievances. The board of directors had not only executed a deed in the company's name to all its property, but had also procured the ratification and express approval of such act by stockholders owning 131,036 shares of its stock. The directors obtained also the consent in writing of these stockholders to the making and delivery of the confirmatory conveyance of May 31st. They called the meeting of June 6th, at which the proposition to ratify the things done by them was to be submitted to the stockholders; and they held irrevocable powers of attorney executed by owners of the number of shares mentioned, running to defendant Bigelow, who was president of the company, authorizing, and, indeed, it would seem, directing, Bigelow or his substitutes to vote in favor of the ratification of, and consent to, the sale theretofore made by Bigelow and the other directors in the name of the Montana company. Admission is made by defendants that the

directors caused the New York company to be organized, to the end that it might take the place of the Montana company, and for the purpose of transferring the property of the latter-named company to the former. The further admission appears that the stockholders whose proxies were held by Bigelow, or his substitutes as attorneys in fact, were desirous of voting in favor of the transfer; and that the 131,036 shares would have been so voted but for the injunction is established beyond doubt. The protest of plaintiffs, made just before suit was begun, against the action of the directors, and against the proceedings proposed to be taken at the meeting of June 6th, was unavailing; and the answer is framed upon the theory that the objection by plaintiffs to the action taken by the directors, and any protest against that intended to be taken, would have been disregarded by the holders of 131,036 shares, as well as by the directors. The law, which does not demand a request that a person or corporation sue him or itself, nor require the doing of any useless thing, as prerequisite to the accrual of a right of action, will therefore, in the circumstances here existing, permit the plaintiffs to maintain suit to undo or. prevent the acts of directors or stockholders performed or threatened to be performed, if such acts be, as to plaintiffs, *ultra vires;* and this is within the principles declared in *Gerry* v. *Bank*, 19 Mont. at page 199, 47 Pac. 813; *Ashton* v. *Dashaway Association*, 84 Cal. 61, 22 Pac. 660, and 23 Pac. 1091; *Botts* v. *Ry. Co.*, 88 Ky. 54, 2 L. R. A. 594, 10 S. W. 134; *Smith* v. *Dorn*, 96 Cal. 73, 30 Pac. 1024; *Barr* v. *Pittsburgh Plate Glass Co.*, 40 Fed. 412; and in conformity with the rule laid down in Pomeroy on Equity Jurisprudence Sec. 1095; *Albers* v. *Merchants' Exchange*, 45 Mo. App. 206; 4 Am. and Eng. Ency. Law, 280; 27 *ib.* 396; 4 Thompson on Corporations Sec. 4521.

2. Another contention of defendants is that the action must fall because the complaint fails to aver that plaintiffs were owners of their shares at the time of the transactions of which they complain. This point is also without merit. The cases cited by defendants in support of their position are not

pertinent.    Equity rule 94, promulgated by the Supreme Court of the United States, provides that "every bill brought by one or more stockholders in a corporation against the corporation and other parties, founded on rights which may properly be asserted by the corporation, must be verified by oath, and must contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share had devolved on him since by operation of law, and that the suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance.    It must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action;" and the federal authorities relied upon are to a great extent based upon that rule, which, of course, is not binding upon the state courts. (*Parsons* v. *Joseph,* 92 Ala. 403, 8 South, 788.)    The other citations are for the most part, if not wholly, of cases in which the stockholders sued to recover for wrongful *intra vires* acts of the officers of corporations, or to obtain an accounting in respect thereto, performed before the plaintiffs in those cases became shareholders.    We deem it unnecessary, however, to inquire whether, in the respect stated, rule 94 is but declaratory of an equity doctrine; for in the case at bar defendants recognize and admit that the transfer is not yet legally consummated, and that, to bring about the desired result, not less than two-thirds of the stock must be voted in favor of the transfer, at a meeting called for that purpose. The vote has not been taken.    To prevent such an attempted ratification or authorization of the proposition submitted as would result from the voting of the shares at the meeting, is the object sought to be obtained by the injunction.

3.    Defendants insist that the 200 shares standing in the names of plaintiffs were acquired by and for the use of the Montana Ore Purchasing company, a rival corporation, between which and the Montana company an unfriendly feeling

exists, and many actions are pending, and of which one plaintiff is attorney, and the other vice president; that the action is not in good faith, but was brought from improper motives, and in the interest of the rival corporation, and not for the benefit of the nonassenting stockholders, and that, for this reason, plaintiffs are not entitled to be heard in a court of equity. The court below found that plaintiffs owned the shares, and that they were acting in good faith; and we cannot say that the evidence received on the hearing so clearly proves the contrary as to warrant us in deciding that the lower court erred in determining the question as it did.   On the hearing of the application for the injunction *pendente lite*, the matter was one peculiarly within the discretion of the court below. Consideration of the elaborate and ingenious argument of defendants discussing the effect of bad motives upon the right to maintain the suit is thus rendered unnecessary; and we do not decide whether or not an injunction ought to be refused against a private corporation in a suit brought by an individual stockholder in the interest of a rival corporation.

4.   It does not appear that plaintiffs were guilty of unreasonable delay or laches in commencing suit.   They instituted proceedings prior to the day on which the stockholders were to meet for the purpose of voting in favor of the transfer theretofore made, or attempted to be made, by the directors; and it is evident that the suit brought to protect whatever rights plaintiffs may have was timely.   (*Mills* v. *Central Ry. Co.*, 41 N. J. Eq., 1, 2 Atl. 453.)   The law did not require them to act before they did, and they have inflicted no legal injury upon defendants, nor have they slept upon their rights for such length of time as might raise the inference of a waiver.

5.   The court did not err in refusing to accept the bond or undertaking tendered by defendants.   (See Cook on Stock and Stockholders, Sec. 502; *Stevens* v. *Rutland R. R. Co.*, 29 Vt. 545; *Railroad Co.* v. *Collins*, 40 Ga. 582; *Tomkinson* v. *Southeast R. Co.*, 35 Ch. Div. 675; Thompson on Corporations, Sec. 345.)   Section 876 of the Code of Civil Procedure confers upon the court a dis-

cretionary power to vacate an injunction granted *ad interim* or *pendente lite*, where the alleged wrong or injury is reparable and capable of being adequately compensated for in money, upon defendant's executing such an undertaking as the court may require. We do not think the court abused its discretion. As counsel well say, if plaintiffs were clearly entitled to an injunction in this case, the district court would not have been justified in accepting an undertaking in lieu of the injunction, which would be licensing the commission of a wrong not susceptible to compensatory damages. Although the present value of the shares held by plaintiffs may be accurately determined by a judgment, and the profits by way of future dividends on their shares that might accrue from the Montana company predicted with approach to reasonable certainty, yet, if the transfer and the vote of the shareholders in attempted ratification thereof be *ultra vires* as to them, then it is manifest, upon the plainest principles of law, that no court may rightly compel them to dispose of their shares *in invito.* (*Tompkinson* v. *Railroad Co.*, *supra*; Beach on Injunction, Secs. 295, 296; *Mills* v. *Railroad Co.*, *supra.*) If, as matter of law, the proposed transfer was shown to be *ultra vires* the corporation, plaintiffs were entitled, as of right, to the injunction; and in such event, were a bond accepted and injunction refused, the fact would seem apparent that the court had decided that plaintiffs' property could not be taken without their consent, and at the same time had permitted it to be done,—an inconsistency needing no comment.

6. Having disposed of the foregoing contentions of defendants, we may state the facts of the case now presented as follows: The Montana company is a solvent and prosperous private corporation, whose business is in a flourishing condition. Its directors have attempted to transfer, by conveyances in its name, all its assets to a foreign corporation, without capital or assets, organized for the sole purpose of acquiring the property and conducting the business of the Montana company. In consideration of such transfer, the directors of the Montana com-

pany have agreed to accept all the capital stock of the foreign
corporation, for distribution among those stockholders of the
Montana company who may desire to exchange their shares
for a like number of shares in the new company, and to those
not willing to exchange the New York company agrees to pay
$170 per share. To this transfer, stockholders owning more
than three-fourths of the shares have consented. Plaintiffs
own 100 shares each, and do not consent. A special meeting
of the stockholders of the Montana company was called for the
purpose of voting upon the proposed ratification of the acts of
the directors, and of approving or disapproving such transfer
of all the property. The court, on application of plaintiffs,
enjoined *pendente lite* the Montana company, its officers and
other stockholders, from voting in favor of the transfer at-
tempted to be accomplished by the directors. The question to
be decided is involved in the statement that the directors and
the holders of more than 87 per cent. of the shares of the
Montana company are attempting to dispose of its entire prop-
erty and business to the New York company, in exchange for
the capital stock of the latter, against the objection of minority
stockholders. The defendants claim that the power so to
transfer exists, while plaintiffs assert that the action intended
to be taken is *ultra vires* the corporation, employing that term
in its strict sense as designating acts which are beyond the
powers of a majority, or of any number less than all, of the
stockholders, as against the minority.

At common law, neither the directors nor a majority of the
stockholders have power to sell or otherwise transfer all the
property of a going, prosperous corporation, able to achieve
the objects of its creation, as against the dissent of a single
stockholder. This doctrine is firmly established by the au-
thority of adjudged cases, and rests upon the soundest princi-
ples. (*Abbott* v. *Am. Rubber Co.*, 33 Barb. 578; *People* v.
*Ballard*, 134 N. Y. 269, 32 N. E. 54; 7 Am. and Eng. Ency.
Law (2d Ed.) 734–736; Cook on Stock and Stockholders, Sec.
667, and the numerous cases there cited.) Our attention is
called to certain decisions which are said to recognize a con-

trary doctrine; but examination discloses no conflict of opinion among the various courts of last resort.     *Treadwell* v. *Manufacturing Co.*, 7 Gray, 393, is typical of the cases relied upon by the defendants.     A short extract from the opinion (page 405) will serve to illustrate the error into which counsel has fallen:     "Upon the facts found in the case before us, we see no reason to doubt that the vote of the majority of the stockholders, for the sale of the corporate property, and the closing of the business of the corporation, was justified by the condition of their affairs.     Without available capital, and without the means of procuring it, the further prosecution of their business would be unprofitable, if not impracticable.     Under these circumstances, it was in furtherance of the purposes of the corporation to pay their debts, close their affairs, and settle with their stockholders on terms most advantageous to them."     In that case, as in every one cited by the defendants, the corporation was unable further to prosecute the purposes for which it was created.

By the common law, the acts complained of are void.     If the stockholders possess the power asserted to reside in them, statutory authority must confer it.     Defendants earnestly contend that such power is given by an act entitled "An act in relation to alienation of mining property by corporations," approved March 9, 1887, and carried into the Fifth Division of the Compiled Statutes of 1887, as sections 492, 493 and 494, which read as follows:

"Sec. 492.     The board of trustees or officers of any mining corporation organized under the provisions of article 1, chapter 15, of the fifth division of the Revised Statutes (chapter 25 of the Compiled Statutes) of this territory shall not have power to sell, lease, mortgage or otherwise dispose of the whole or any part of the mining ground, quartz mills, smelters, concentrators or reduction works of such corporation, unless they shall have first called a meeting of the stockholders of such corporation in the manner prescribed in section 468 of said article (chapter 25) for the purpose of submitting to the stockholders of such corporation the proposition so to sell,

lease, or mortgage or otherwise dispose of the property of such corporation or some portion thereof. The notice so required to be published and sent to each stockholder shall distinctly specify each particular tract or piece of property so to be leased, sold, mortgaged or otherwise disposed of and the particular disposition to be made thereof.

"Sec. 493. If at the time and place specified in the notice provided for in the preceding section stockholders shall appear in person or by proxy, representing not less than three-fourths of all the shares of stock of the corporation, they may organize by choosing one of their number chairman of the meeting, and also a suitable person for secretary, and proceed to vote on the proposition mentioned in said notice. If there are distinct pieces or parcels of property embraced in the proposition, each separate piece of property capable of being disposed of in one parcel without material injury to the remainder shall be voted on separately. If on canvassing the votes it shall be found that at least two-thirds of all the shares of the capital stock of such corporation have been voting in favor of selling, leasing, mortgaging or otherwise disposing of a given piece or the whole of said mining property, then the chairman and secretary of such meeting shall make a certificate showing the total number of shares of the capital stock of such corporation represented in such meeting and by whom voted; the number of shares voted in favor of the proposition and the number of shares voted against the same. Such certificate shall be signed by the chairman, countersigned by the secretary and verified by their oaths, taken before some officer qualified to administer oaths. Such verification shall be to the effect that the matters and things therein contained are true, and that the meeting at which such proceedings were had was called and held in pursuance of law, to the best of their knowledge, information and belief. Such certificate shall be spread at length on the record of stockholders' meetings of such corporation, and a copy thereof under the seal of said corporation, and attested by its president and secretary, and duly acknowledged, shall be recorded in the office of the county recorder of every county wherein any of such property is situated.

"Sec. 494. If a sale shall be made as above provided of the whole of the property of such corporation, the corporation shall thereby be dissolved, and its affairs shall be wound up as provided for in other cases of the dissolution of corporations."

Defendants argue with much vigor, and some plausibility, that these sections constitute an enabling act, which grants to stockholders owning two-thirds of the shares the power to dispose of all the property of a solvent and prosperous corporation despite the protest of other stockholders. Now, by the common law, a solvent and prosperous corporation may, with the unanimous consent of its stockholders, dispose of its entire assets, but may not do so without such unanimity. Again, at the common law, a corporation which is insolvent or unable to execute the purposes for which it was created may, by its directors (or, at least, by the directors and a majority of its stockholders), sell or assign all its property when the best interests of the stockholders would be served thereby. In the proper pursuit of its business, and within the purposes for which it was created, a corporation may, by the common law, sell, lease or mortgage any part of its property, though the minority, or perhaps the majority, of the stockholders dissent.

Have the statutes quoted altered the common law in the respects mentioned? It is to be borne in mind that the common law, so far as it is applicable and of a general nature, and not in conflict with the constitution or with special enactments of the legislative assembly, is the law and rule of decision in this state, and is in full force until repealed by statute. Such is the declaration of Section 201, Div. 5, Compiled Statutes of 1887. It is to be observed, also, that a statute is not presumed to work any change in the rules of the common law beyond what is expressed in its provisions, or fairly implied in them, in order to give them full operation. For the written law to effect a repeal of those doctrines of the common law which are not unsuited to our condition, the intent of the legislature to bring about the change must be clear; and, if the intent be not fairly evident, the common law remains the rule

of decision. "Statutes are not presumed to make any altera-
tion in the common law," say the court in *Arthur* v. *Boken-
ham*, 11 Mod. 150, "further or otherwise than the act does
expressly declare.   Therefore, in all general matters, the law
presumes the act did not intend to make any alteration; for,
if the parliament had that design, they would have expressed
it in the act." The rules of the common law are not to be
changed by doubtful implication ( *Wilbur* v. *Crane*, 13 Pick.
284; *Hollman* v. *Bennett*, 44 Miss. 323); and "an intention
on the part of the legislature to alter the statute law is some-
times presumed upon much slighter grounds than would sup-
port any such inference in the case of the common law" (End-
lich on Interpretation of Statutes, Sec. 127).   This court has
often held that statutes in derogation of the common law
should be strictly construed.   (*Hardware Co.* v. *Sullivan*, 7
Mont. 307, 16 Pac. 588; *Palmer* v. *McMaster*, 8 Mont. 186,
19 Pac. 585.)   The effect of the provision embraced in Sec-
tion 3452 of the Code of Civil Procedure of 1895, with respect
to the interpretation of statutes in derogation of the common
law, is not of concern in this case.

By Section 450, Div. 5, Compiled Statutes of 1887, it is
provided that the stock, property and concerns of an indus-
trial corporation shall be managed by trustees; and section
482 of the same division declares that every such corporation
has power, among other things, "to hold, purchase and con-
vey such real and personal estate as the purposes of the cor-
poration may require." Sections 450, 482, 492, 493 and
494, *supra*, should be read together as one statute.   In our
opinion, sections 492 to 494, inclusive, were intended for the
protection of stockholders in a mining corporation.   The leg-
islative assembly seemed to be of the opinion that the interests
of stockholders in such corporations were not sufficiently
guarded by the principles of the common law, under which a
sale, mortgage or lease, or an assignment for the benefit of
creditors, could be made by the trustees or directors alone, or
by them with the consent of the majority of the shares, pro-
vided the exigencies of the corporation required such disposi-

tion to be made; and for that reason, doubtless, it enacted sections 492, 493 and 494, *supra.* By section 492 the trustees are declared to be without power to sell, lease, mortgage or otherwise dispose of certain mining property of their corporation, without first calling a meeting of the stockholders; and by section 493 it is provided that, if two-thirds of the stockholders vote in favor of the proposition submitted, a certificate of that fact shall be made and recorded in the office of the recorder of the county in which the property is situate. Neither of these sections declares that the trustees or corporation may sell at all. In section 494 there is, at most, an implication only that a sale may be made if not less than two-thirds of the shares consent thereto. If a sale of the whole of the property results from proceedings conducted in conformity with the provisions of sections 492 and 493, the corporation is thereby dissolved, and its affairs must be wound up according to the provisions of section 489 by a division among the stockholders of the money and other property that shall remain after the payment of the debts and necessary expenses. Where, under sections 450 and 482, the directors would have the right, at least with the consent of a majority of the shares, to convey or otherwise dispose of the property mentioned in section 492, they may not now do so without the consent of the stockholders owning two-thirds of the shares. As we have said, at common law the directors (at least with the consent of the majority of shares) may sell the entire corporate property when the exigencies of a waning business require such action; while, to sell the entire property of a going, prosperous corporation, the consent of all the stockholders is necessary. In view of the language of the statutes quoted, there is strong reason to believe that the legislative assembly intended to prevent the alienation of the mining property specified in section 492, in any and all cases, without the consent of two-thirds of the shares. The language used in that section, being negative and prohibitory, and not permissive, also favors the conclusion that the statute was intended as a limitation upon the common law powers possessed by the directors and a majority of

the shareholders, and not as a grant of power. The statute operates, not as an enlargement, but as a restriction of corporate power. Another consideration may be suggested as lending support to this conclusion: A transfer or other disposition of all its property will not *ipso facto* dissolve a corporation, although the practical effect thereof may be to defeat the object of its organization. This is so because ownership or possession of property is not essential to corporate existence. (*Gans* v. *Switzer*, 9 Mont. 408, 24 Pac. 18; 9 Am. and Eng. Ency. Law (2d Ed.) 565.)

A flourishing mining corporation may desire to sell or otherwise dispose of its entire assets for the purpose of reinvesting the proceeds in a new enterprise within the corporate purposes, or of acquiring other mining property. Such sale or other disposition might be made at common law with the unanimous consent of the stockholders, without working a dissolution; nor would a dissolution be produced by the sale or assignment of the whole property of an insolvent corporation made by the directors, either with or without the consent thereto of all the stockholders therein. It does not seem that the legislature, when it enacted sections 492 to 494, *supra*, intended that the dissolution of a prosperous mining corporation, able to continue its existence and to accomplish the objects of its creation, should be brought about by the mere fact that it has sold all its assets. It was, however, the evident design of the legislature that a sale, made under sections 492 and 493, of the entire property of an insolvent mining corporation, or of one unable to perform the objects of its organization, should effect its dissolution, and that any transfer or disposition other than a sale would not have such an effect.

There seems to be reason for affording greater protection to stockholders in mining than to those in other industrial corporations. Mining, of all legitimate enterprises, is probably the most uncertain, and, indeed, precarious. Mines and mining claims are more subject to sudden and unexpected fluctuations in value (or seeming value) than is any other character of real property; and this is true in a peculiar degree as to those of

gold and silver, which in 1887, when the act was passed, before the copper output of Montana was as considerable as it has since become, constituted the chief mining interest in the state. The temptation to sell or dispose of such property unadvisedly or fraudulently, and the facilities to that end recognized by the common law, induced the legislature to prohibit any transfer not consented to by two-thirds of the shares.

In reaching the conclusion announced, we have not overlooked Sections 467, 468, 469, 488 and 489, Fifth Div. Comp. Statutes of 1887, providing that an industrial corporation may increase or diminish its capital stock, extend or change its business to any other branch of corporate pursuits, extend the term of its life, or dissolve and disincorporate itself by appropriate proceedings, whenever two-thirds of the stockholders at a meeting called for that purpose decide by vote so to do; although counsel do not seem to rely upon them. We are satisfied that none of them has application to the facts presented in the case at bar. The meeting of June 6, 1898, was not called for the accomplishment of a purpose within the purview of the sections to which reference has just been made.

There is another reason why the attempted disposition of the property is *ultra vires* the corporation. Even if it be conceded that the act of March 9, 1897, is an enabling act, clothing the directors and the stockholders owning two-thirds of the shares with power not possessed at common law, yet the disposition intended to be made is not one authorized by the act. Manifestly, the transfer proposed lacks an element necessary to constitute a sale, namely, a pecuniary consideration. To constitute a sale, there must, as a general rule, be a consideration in money. The proposed transaction is, at best, merely an exchange; and the defendants claim that the expression "or otherwise dispose of," used in section 492, operates to confer upon the corporation the power to exchange as well as to sell the entire property of the corporation without the consent of every stockholder therein. We do not think the general enumeration of the powers by the terms "sell, lease, mortgage, or otherwise dispose of" operates

either to confer upon mining corporations the power to exchange, or as a recognition of it as already possessed by other industrial corporations.    The words ''or otherwise dispose of'' are not sufficiently vigorous to justify the construction urged by defendants; and, in so far as they may seem sufficiently significant to require their application to powers other than those specifically named, they may be satisfied by reference to the right to assign for the benefit of creditors, to hypothecate or pledge, or possibly even the right to remove or destroy, the mills, smelters, concentrators, or reduction works, rather than by allowing them, by mere implication, to create or recognize a power radically different from those particularly specified.    It must be admitted that the sale of the assets and the distribution of the proceeds is vitally different from the enforced exchange of those assets for the capital stock of a foreign corporation; and, in recognition of this difference, counsel claim that the statute confers the power to exchange, in addition to the power to sell.    In exercising the power of sale which defendants claim is conferred by the statute, it would be necessary for those in control of the corporation to act with a due regard for the interests of all stockholders, and to pursue such a course as would insure the accomplishment of the best result attainable; and if those holding the requisite majority of the stock should not only determine that the entire assets of the company should be sold, but should adopt and direct such method of procedure as would prevent competition, or in any other way involve a sacrifice of the corporate assets or endanger the interests of any of the stockholders, such proceeding could be checked and controlled by the courts, as both the management and the winding up of the corporation may properly be regarded as the performance of a trust with which the property is charged for the benefit of all who are entitled to share in the division of the profits or in the distribution of assets.

Assuming, then, that the holders of two-thirds of the stock of the corporation may legally decide many vital questions concerning the affairs of the corporation, and lawfully execute

the plans thus adopted, notwithstanding the opposition of the minority, and that they may sell all the assets of a solvent, prosperous corporation, and thereby dissolve it, yet it must always be remembered that co-extensive with these large powers are correspondingly important duties, which devolve upon those who are intrusted with the right to determine the direction of the corporate affairs. Hence, under such circumstances, the minority, though powerless to prevent the sale, may insist that the method of procedure shall be such as would be fair and proper in the discharge of any other trust under which they were beneficiaries. By recognizing this relation of trustee and beneficiary as existing, at least by analogy, between the stockholders in control or the directors selected by them and the minority stockholders, the further distinction between a sale and a mere exchange of corporate assets is fully appreciated.

It has been suggested that a power of sale must include the power to exchange, because the greater includes the less; but no such comparison can properly be made, as neither includes the other, and neither is part of the other. In the event of a sale, properly and fairly conducted, whether by public auction, by sealed bids, or by any other method calculated to produce the best result attainable, each of the stockholders has an equal right to become the purchaser of the whole or any part of the corporate assets, each is equally interested in obtaining the highest price for the common property, and each is entitled to an equal *pro rata* share of the proceeds; but if the holders of any number of shares, however large, be authorized to exchange the corporate assets for the capital stock of a foreign corporation, the law furnishes no measure by which to determine the prudence or wisdom of the exchange, or to test the fidelity of those clothed with the power and charged with the duty incident to such proceedings. If defendants' contention be correct that Sections 492 and 493 contain a grant of power, these *quasi* trustees may, when authorized by two-thirds of the shares, determine to convert the assets into cash, and distribute the proceeds among those

beneficially interested; but they cannot change the nature of the trust estate except in the manner provided by law, and they can then do so only for the purpose of continuing operations in this state, and not for the purpose of transferring the *corpus* of the estate or its ownership to a foreign jurisdiction. (*Taylor* v. *Earle*, 8 Hun. 1.) It is true that, under our laws, the holders of the requisite majority of shares in a mining corporation may determine to abandon the mining industry, and, for example, embark in a manufacturing enterprise, by amending their charter, and may sell the mining assets, and reinvest in proper purchases for the new corporate object; but these steps, however important, are part of the internal management of a domestic corporation, and must be conducted in accordance with our law. The power to exchange the corporate property for the capital stock of a foreign corporation is not incident to these proceedings.

But there seems to be neither a sale or an exchange nor other disposition of the mining property, within the meaning of the statute. "To otherwise dispose of" does not signify and include "to give away," within the meaning of the statute. The New York corporation is formed. It has no property. It possesses nothing but a name. Attempt is made in the name of the Montana company to convey its property to the New York company, for which the Montana company receives nothing in return. It does not exchange its property for other property. There is, in effect, simply a change of corporate habitation. So far as stockholders are concerned, they are, perhaps, permitted to exchange their shares in the Montana company for the same kind of property in another state, and the laws of Montana for the laws of New York. The statute does not provide that, by a two-thirds vote, stockholders shall exchange their shares for shares in another corporation, or in the same corporation with changed citizenship. It has no reference to such a scheme. A stockholder, we think, may not be compelled to take, in lieu of his stock in the Montana corporation, an equal number of shares in the New York corporation, or the value of those

shares; nor can he be compelled to accept payment for his shares in any other way than that prescribed by the Montana statute on a dissolution of the Montana corporation. The Montana company conveys all its property, and gets nothing in return. If the trustees attempt to wind up its affairs, under section 489, *supra*, there would be nothing to distribute. The new company promises to issue certain of its shares to each Montana stockholder, but we are unable to see how he can be deprived of his interest in the Montana company without his consent. Our statutes do not seem to confer upon two-thirds of the stockholders of a solvent and prosperous corporation the right to take the citizenship of the corporation to another state, without the consent of all the stockholders. The transfer of the seat of corporate authority, and domicile and citizenship, of a corporation, from one jurisdiction and state, under whose constitution and laws the corporation has been organized and conducted, to another jurisdiction and state, with a different constitution and code of laws, certainly should not be undertaken without clear and ample authority; and no authority is found in our statutes permitting this to be done. *Taylor* v. *Earle, supra,* is directly in point.

Holding, as we do, that the proposed transfer is *ultra vires* the corporation, and therefore void, consideration of the question whether the transaction would, if accomplished, result in a consolidation or merger of the Montana company with the New York company, is unnecessary. The order appealed from is affirmed.

*Affirmed.*

PEMBERTON, C. J., and HUNT, J., concur.

## ON RE-HEARING.

[December 21, 1898.]

The bona fide purchaser of stock may enjoin the ratification of an illegal transfer of corporate property which was *ultra vires* and made before his purchase, the former owners of the stock never having acquiesced in the transfer.

On an appeal from an order granting an interlocutory injunction, the trial court will be presumed to have found all controverted facts necessary to support the order in favor of the prevailing party.

An order granting an interlocutory injunction will not be vacated on the ground that one of the plaintiffs is prohibited from bringing the action.

Section 405, Code of Civil Procedure, which provides that an attorney must not, directly or indirectly, buy a bond, note, bill of exchange, or other thing in action, with the intent and for the purpose of bringing an action thereon, does not include shares of the capital stock of a corporation.

The Supreme Court will not, ordinarily, on application for a re-hearing, consider grounds for reversal not presented on the hearing.

PER CURIAM.   Appellants have moved for a re-hearing on several grounds, which we shall very briefly consider.

1.   It is insisted that respondents have no standing in equity, for the reason that the shares standing in their names were not held by them at the time the acts complained of were committed, and have not devolved upon them since by operation of law.   This contention was fully presented on the hearing, is discussed in subdivision 2 of the opinion, and held untenable, because respondents were the owners of the shares when they sought to obtain the injunction restraining appellant from voting the stock controlled by them in favor of ratifying the transfer theretofore attempted to be made, and from authorizing a transfer in the name of the Montana company to the New York company.   Counsel seem to labor under the impression that the court has overlooked the fact that respondents were not owners at the time the directors made the transfer, and urge that this alone is sufficient to defeat them.   We cannot agree with counsel.   The statement of facts preceding the opinion discloses that the shares were never voted in favor of the transfer, and that the former owners in no wise assented thereto; hence the stock reached respondents free from any such burden or taint in respect to the proceedings taken by the directors as perhaps might have

followed upon consent or acquiescence in the transfer by the former owners. Appellants fail to recognize the distinction between the right of the holder of shares to complain of an *ultra vires* act committed before he acquired them, which the former owner neither participated in nor assented to, and the attitude of one acquiring shares with knowledge that the former owner had voted them in favor of the act afterwards sought to be annulled by the later holder. In the one case the present holder is not estopped or debarred from maintaining suit, unless by force of some statute or rule of court, while in the other case it would seem that the assignee of the shares would succeed to, and be affected with, the disability of the prior owner to object to the act which theretofore had been approved by him. (See Morawetz on Private Corporations, Sections 264–268.)

Counsel assert that so much of equity rule 94, promulgated by the Supreme Court of the United States, and quoted in the opinion, as requires the complaint to contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share has devolved upon him since by operation of law, is but declaratory of the equity practice. No such principle, however, has ever prevailed in courts of equity. On the contrary, the transferee in good faith, who has acquired his shares after an *ultra vires* act has taken place, obtains, to say the least, the rights possessed by the prior holder, and the transferee's right of action is derived by purchase of the shares from the former owner; and if the former owner has neither voted the shares in favor of, nor acquiesced in, the unauthorized act, the transferee is not disqualified from maintaining a suit to annul such act, upon the ground that he was not a shareholder at the time of the transaction of which he complains. The doctrine is so well established, and rests upon such solid foundations, that citation of authorities seems useless. We venture, however, a quotation from the opinion in *Winsor* v. *Bailey*, 55 N. H. 218, one case out of the multitude which recognize the doctrine: "It is contended for the defendants that the bill is

defective, in not showing that they were owners of stock at the time of the alleged wrongful payment to some or all of the defendants. No authority is referred to in support of this position, and I see no sound reason upon which it can be sustained. To hold so would seem to involve the singular consequence that the transfer of stock in a corporation extinguishes the right to inquire into the previous fraudulent conduct of its officers, whereby its funds have been misappropriated. * * * The plaintiffs allege that they are stockholders in the Hooksett Manufacturing company, and specify the number of shares owned by each, but do not allege that that they were stockholders at the time the dividend was paid the defendants. But that is not necessary, and it is immaterial whether they were or not. The transfer of the stock conveyed to them, not only the ownership of the shares, and the right to the future dividends thereon, but also placed them on an equal footing with the other stockholders in respect to the right to call the officers and agents of the corporation to an account for their fraudulent conduct.''

Appellants rely upon the remarks of the court in *Alexander* v. *Searcy*, 81 Ga., at page 550, S. E. 630, to the effect that, by the weight of authority, a person who did not own stock at the time of the transactions complained of cannot maintain suit to have them declared illegal, to which are cited some federal decisions. The view of the Georgia court is founded upon an erroneous assumption that the rule peculiar to the federal courts is declaratory of equity practice, or is to be observed in state courts. That portion of equity rule 94 which appellants say ought to govern here, and which, so far as the United States courts are concerned, obliterates the well-founded distinction indicated, was adopted by the federal supreme court, after the decision in *Hawes* v. *Oakland*, 104 U. S. 450, as a measure tending to prevent the bringing of suits in federal courts which the jurisdiction of those courts is not intended to embrace, and which are properly cognizable in the state courts. But neither the rule nor the peculiar reason upon which it rests should be followed by state courts

in administering the general principles of equity. The following quotation from section 269 of the treatise of Mr. Morawetz on Private Corporations is pertinent: "The supreme court has authority, under the judiciary act, to establish rules of practice, but not to alter the substantive law. Equity rule 94 is mainly declaratory of the existing law. The only material change which it makes is to require the plaintiff to show that he was a shareholder at the time of the transaction of which he complains, or that his share has devolved upon him since by operation of law. This requirement was evidently designed as a rule of practice merely, and was deemed by the supreme court to be necessary in order to guard the courts from being imposed upon by collusion of the parties." To the same effect, see Cook on Stock and Stockholders, Sec. 737; Wait on Insolvent Corporations, Sec. 628; Spelling on Private Corporations, Sec. 467. Were equity rule 94 applied in all courts, the holders of shares purchased after the doing of an act *ultra vires* would be remediless; for no tribunal could take cognizance of, or undo, the wrong perpetrated.

2. It is next claimed that "the evidence conclusively, and without contradiction, establishes that Forrester and MacGinnis bought this stock for the purpose of bringing this action" in the interest of a rival corporation, and that the court below did not make a finding to the contrary. As to the point that the evidence does not justify the conclusion which was reached by the court below, we quote from subdivision 3 of the opinion: "The court below found that plaintiffs owned the shares, and that they were acting in good faith, and we cannot say that the evidence received on the hearing so clearly proves the contrary as to warrant us in deciding that the lower court erred in determining the question as it did. On the hearing of the application for the injunction *pendente lite*, the matter was one peculiarly within the discretion of the court below." This we reaffirm. We have again examined the testimony preserved in the record, and now add that the inferences deducible therefrom would

have justified the court below in determining either that plaintiffs, in acquiring the shares and bringing the suit, were prompted by improper motives, or that they did so in good faith.    Whether or not there was a formal finding sufficient to withstand technical objections of the most refined subtlety, we do not pause to discuss; nor is it necessary to decide whether express findings of fact are recognized in practice as properly the basis of an intermediate order, since the presence or absence of such a finding in the present case is not material. Where the evidence is in substantial conflict, or (which is the same thing) where the evidence is reasonably susceptible of different inferences, the trial court must (at least, in the absence of express findings) be presumed to have impliedly found every fact necessary to support its interlocutory injunction order, or, rather, in a case on appeal from such order, is presumed to have determined the question upon which the conflict exists in favor of the prevailing party.    We again refrain from intimating any opinion as to whether a purchase of stock with the intention of suing in the interest of a rival corporation, and not for the benefit of nonassenting shareholders only, would entitle plaintiff to relief.    The facts disclosed do not demand the expression of an opinion upon that question.

3.    Our attention is called to the opinion in *Campbell* v. *Argenta Gold and Silver Mining Co.*, 51 Fed. 1, in which it was held that the act of the president and secretary in making a mortgage of the entire property of a mining corporation in pursuance of the unanimous vote of stockholders at a meeting not called or held in conformity with Section 468 of the Fifth Division of the Compiled Statutes of 1887 is not *ultra vires*, but as against all the world, except the corporation and its stockholders (who were, under the facts, estopped), is valid; and, in commenting on this opinion, counsel say:    "As we understand it, the act *ultra vires* is one that under no circumstances could a corporation perform, and that, if the act is such as is within the power of the corporation to perform under the circumstances, it is not *ultra vires*, but *intra vires*."

There should be no question as to the sense in which this court employed the term, for we declared in paragraph 6 of the opinion:  "The defendants claim that the power so to transfer exists, while plaintiffs assert that the action intended to be taken is *ultra vires* the corporation; employing that term in its strict sense, as designating acts which are beyond the powers of a majority, or of any number less than all, of the stockholders, as against the minority."

4.    It is again urged that the New York company is not only a purchaser for value, but, in issuing its stock for the property, became a purchaser in good faith—as much so as if money had been paid for the property—and that, therefore, the court, in deciding that the transfer was not a sale, is in error as to the law.    The opinion carefully considers this argument, and we are satisfied with the course of reasoning and the conclusion reached.

5.    Appellants renew their contention that Sections 492, 493 and 494 of the Fifth Division of the Compiled Statutes of 1887 constitute an enabling act, which grants to stockholders owning two-thirds of the shares power to effect, through directors or officers, a disposal of all the property of a solvent and prosperous corporation, notwithstanding the dissent of other stockholders.    No new reasons have been advanced in support of appellants' position, and, upon further consideration, we are entirely satisfied with the determination heretofore made.

6.    Section 405 of the Code of Civil Procedure provides: "An attorney and counselor must not, directly or indirectly, buy or be in any manner interested in buying, a bond, promissory note, bill of exchange, book debt, or other thing in action, with the intent and for the purpose of bringing an action thereon."    In their brief upon this application, appellants invoke the provisions of this section.    It appears that plaintiff Forrester, who resides and practices his profession without the state of Montana, is one of the attorneys of the Montana Ore Purchasing Company.    Counsel say they "do not contend that section 405, literally construed, applies exactly to Mr. For-

rester's position,'' but suggest that a broad view of the statutes would include it. We might dispose of this contention by referring to what has been said in the original opinion, and here, in respect of the conflict of the evidence as to the purpose of plaintiffs in purchasing the stock and bringing the suit, but we prefer to state some of the reasons why section 405 is inapplicable. In the first place, plaintiff MacGinnis is free from the supposed disability alleged against Forrester. Again, the action was not brought upon a thing in action. Our statute seems to have been borrowed from New York, which 1 as a section identical in effect with section 405; and in *Ramsey* v. *Gould*, 57 Barb. at page 408, the court, in construing the section, said: ''The chose in action intended by the statute is one on which a suit can be brought. This action is not brought upon the stock. That is not the cause (subject?) of action; and although, in some respects, it may resemble a chose in action, it is not strictly such. The statute is a penal one, and cannot be extended to what is not expressly included in it. It is plain, I think, that the purchase of stock was not a violation of the statute, and that the complaint cannot be dismissed upon this ground.'' And of this we approve. Moreover, the point that section 405 is applicable to Forrester was not made on the argument upon which the case was submitted; and the general and well-founded rule is that the supreme court will not, ordinarily, on application for a rehearing, consider grounds which were not presented on the hearing. (*Merchants' National Bank* v. *Greenhood*, 16 Mont. 460, 41 Pac. 250, 851.) While there seems to be no reason why the rule should be departed from in this case, or why this motion should be excepted from its operation, yet the statute relied on is so manifestly without application that we feel no hesitation in so declaring.

7. Another reason urged in support of the motion for a rehearing is that ''the decision conflicts with the whole weight of authority of the best considered American cases.'' The result of attentive examination which we have given to the citations furnished us by appellants fails to sustain their assertion.

The foregoing disposes of every point made by appellants which is worthy of comment. After full discussion, participated in by all the justices, we are, upon mature reflection and deliberation, satisfied that the better reasons, as well as the established principles of law, sustain the decision heretofore rendered; and such is the unanimous opinion of this court. The motion for a rehearing is denied.

*Motion denied.*