MERCANTILE COMMERCIAL BANK, RECEIVER, *v.*
SOUTHWESTERN INDIANA COAL CORPORATION ET AL.

[No. 13,399. Filed December 6, 1929. Rehearing denied May 1,
1930. Transfer denied November 17, 1931.]

314

*Winfield K. Denton, Horace R. Foncannon* and *William D. Hardy,* for appellant.

*Thompson, Rabb & Stevenson, Joseph H. Iglehart, John K. Chappell, Morton C. Embree* and *Charles O. Baltzell,* for appellees.

NICHOLS, J.—Action by appellant, as receiver of the Vulcan Coal Company, upon the demand of a stockholder in said company, to recover assets of it, which it had wrongfully and illegally attempted to transfer or convey to appellee Southwestern Indiana Coal Corporation and which said appellee had leased to appellee Enos Coal Mining Company.

The complaint in one paragraph is very long, covering, with its exhibits, 54 pages of the record. For the purposes of this decision, it may be epitomized as follows: Appellant, receiver, was duly appointed and authorized to bring this action; the Vulcan Coal Company is a corporation duly organized to conduct the business of mining coal and to do all things incidental to such business and properly connected therewith. In March, 1921, appellees Lucas, O'Brien, Low, Biddle, Lewis, Cohen and Buckingham, hereinafter called "the Ohio parties," residing in Ohio, and for whom appellee

Buckingham was trustee, held options on lands in Pike County, Indiana, to the amount of 1,035 acres, which lands were underlaid with coal near the surface and were suitable for strip mining. The Ohio parties had paid $10 per acre therefor, which gave them the right to purchase for $125 per acre, with a provision that the $10 per acre should be credited on the purchase price, leaving a balance of $115 per acre to be paid, further providing that another $10 per acre should be paid on or before June 18, 1921, which would leave a balance of $105 per acre, and that, when an additional $35 per acre, being one-third of said balance, was paid, the landowners would convey the lands to the holders of the options and take notes for the unpaid balance of $70 per acre, secured by mortgages. In March, 1921, the Vulcan Coal Company, hereinafter called "Vulcan," through its directors, entered into a contract with said option holders, in which it was agreed that said company should assume the unpaid balance of $115 per acre, and pay to such holders the further sum of $210 per acre, making the price of said lands to said company $325 per acre. Said $210 per acre was to be paid in two notes of $25,000 each, one due on June 1, 1921, and the other due September 1, 1921, and the balance in stock of the Vulcan at the par value thereof.

On January 3, 1922, a contract was signed by the Vulcan, through its president, in which it was provided that said company should be designated as the party of the first part, appellee Julian should be designated as party of the second part, and appellees Quarrie, Reeve and Phillips, all of Chicago, Illinois, should be designated as parties of the third part, and that the said parties of the third part, hereinafter called "Chicago parties," should loan to the Vulcan $18,000 to enable it to pay the $35 per acre, amounting in all to $35,500, necessary to secure deeds to said lands, the $10 per acre

due on June 18, 1921, having been paid by the Vulcan; and said contract further provided that the Chicago parties should purchase from the Ohio parties for $26,300 the notes of the Vulcan for $50,000 and $90,000 worth, par value, capital stock of the Vulcan, all held by said Ohio parties, and that, when said $35 per acre was paid by the Vulcan, the land should be conveyed to the said L. G. Julian, as trustee, and that, on the performance by Vulcan of its part of said contract by April 3, 1922, and the payment of all its indebtedness to said Chicago parties, Julian, trustee, should convey said lands to the Vulcan, but that, on default on April 3, 1922, of said company in the payment of any of said indebtedness or performance of any of the conditions of said contract, Julian, trustee, should convey said property to the Chicago parties. There was included in this contract an additional 114-acre farm. Said contract was not authorized by the stockholders of the Vulcan at any regular meeting or at any special meeting called for that purpose, and was never consented to individually or collectively by said stockholders.

Thereafter, on May 12, 1922, an agreement in writing in two parts was signed by the Vulcan by its president and by appellee Reeve, as trustee for said Chicago parties, in which, after reciting that Julian, trustee, had conveyed said lands to said Chicago parties, and that there was doubt as to whether said Vulcan had any equity in or rights to said lands, and that, as it was desired to compromise and adjust said matters, the time for the purchase of said lands should be extended for a period of 60 days on certain terms and conditions therein set out.

Said contract was not authorized by the stockholders of the Vulcan at any regular meeting, or at any special meeting called for that purpose, and was never consented to individually or collectively by said stockhold-

ers, and was never at any time ratified or approved by the stockholders in any manner.

At the expiration of said 60-day period, the Vulcan, not having paid said notes, the Chicago parties took possession of the lands under claim of ownership. In January, 1923, the Chicago parties made a written proposition to the Vulcan to enter into a certain contract with it, which proposition was tendered to the Vulcan at a meeting of its stockholders held on January 29, 1923, at the McCurdie Hotel, Evansville, Indiana, by which they proposed to organize a new corporation which was to take title to the 1,035 acres of coal lands owned by the Vulcan, by Reeve, trustee, advancing all necessary sums of money required to clear said coal lands of all incumbrances thereon. The new corporation was to give its note in payment of the indebtedness of Reeve, trustee, and his associates against said property, which amounted to approximately $122,000, plus expenses incurred to date and accrued interest, plus such sums as might be advanced by Reeve and his associates to clear said coal lands of incumbrances thereon, as above provided for, together with interest thereon. This note was to be secured by a first mortgage on the property.

The new company was to issue preferred stock having par value equal to the indebtedness to Mr. Heerdink and Mr. Julian in payment to them of the indebtedness amounting to approximately $25,000 owing them by the Vulcan, this to cover money actually loaned to the Vulcan, but did not include moneys which they had paid to the Vulcan for stock.

The new company was to transfer to the Vulcan 49 per cent of its common stock, to be in full satisfaction and discharge of all claims of the Vulcan and of its stockholders of any kind or character in and to said property. The new company was to issue 51 per cent

of its common stock to Reeve, trustee, and his associates. The Vulcan, upon receipt of the 49 per cent of the common stock of the new corporation, was to give a quit-claim deed to said property. There was at that time about $45,000 yet due the farmers on a portion of this property. Most all of these farmers had commenced suit against Julian, the Vulcan and Reeve, trustee, to foreclose their mortgages. The action of certain stockholders of the Vulcan in starting litigation had clouded the title of the property, and, therefore, the Chicago syndicate did not intend to finance the proposition further until a new arrangement could be made whereby the title to the property could be cleared in order that it might be sold, or that an arrangement might be made to operate it. At such meeting of the stockholders, this proposition was accepted, with the modification by resolution to the effect that, instead of Heerdink and Julian receiving $25,000 of preferred stock in the corporation to be formed, they should receive a second mortgage, to be subject to the first mortgage provided for, to be given to Reeve and his associates, and the directors of the Vulcan were authorized and directed to agree with Reeve and his associates on all details in connection with the carrying out of the proposal, and to do all acts and things necessary in order to give full force and effect to its terms.

Notice of the said meeting was not mailed to all of the stockholders, and some of them to whom notice was not mailed had no knowledge thereof, but appellant was unable to give the names of them, and all of the stockholders were not present at such meeting, and said proposition of said Chicago parties was never agreed to or ratified or consented to by all of the stockholders of the Vulcan.

Under date of July 21, 1923, the Chicago parties submitted to the board of directors of the Vulcan a propo-

sition in writing which was different from the proposition submitted to the meeting of said stockholders on January 29, 1923. It proposed to incorporate the "Southwestern Coal Corporation" substantially in accordance with the draft attached. It recited that, since the stockholders' meeting of January 29, 1923, Reeves, trustee, had acquired title to 195 acres of coal land in addition and contiguous to the 1,149 acres, and proposed to convey the said 195 acres to the proposed corporation, and take back a mortgage for $34,125 to secure the additional investment. It recited that the investment of Reeves and his associates in said 1,149 acres amounted to $176,000, and proposed to place four mortgages or trust deeds against said coal lands as follows: A first mortgage on the 1,344 acres to secure bonds or notes in the principal sum of $50,000; a second mortgage on the 1,149 acres to secure bonds or notes in the principal sum of $126,000; a third mortgage on said 1,149 acres to secure notes to Heerdink and Julian in the principal sum of $26,567.45; a second mortgage on said 195 acres of land to secure notes to Reeves, trustee, in the principal sum of $34,125, this being at the rate of $175 an acre for said 195 acres. All said bonds or notes to be dated July 1, 1923, and to bear interest at the rate of seven per cent per annum from date.

There is much of the detail of the proposal which we do not set out. This proposal was accepted, and, by resolution at a meeting of the board of directors on August 1, 1923, the officers of the Vulcan were authorized and directed to execute to the proposed corporation the quit-claim deed of the Vulcan to the 1,149 acres as soon as the proposed plan had been carried out to the point where 49 per cent of the stock of the corporation to be formed could be issued to the Vulcan; and the officers of the Vulcan or any two of them were further authorized to agree to any and all further details and

to see to and take any further steps which, in their opinion, were proper and advisable for the purpose of fully carrying out the plan which was outlined in the written proposal dated July 21, 1923.

On the incorporation of said Southwestern Indiana Coal Corporation, and the execution by the officers of said Vulcan of a quit-claim deed to said lands to such corporation, certificates for 49 per cent of said capital stock of said latter company were issued and delivered to the Vulcan and certificates for 51 per cent to the Chicago parties; said Chicago parties did not pay the par value of said stock or any consideration whatever for the same, and thereby violated §22 of ch. 35 of the acts of the General Assembly of the State of Indiana for the year 1921, under which said corporation was organized and incorporated.

The statutes under which the Vulcan was incorporated and was operated are §§5062-5170, inclusive, Burns 1914 and amendments thereto. That one of said sections (§5088 Burns 1914, *supra*) under which said corporation was organized and was operated, as amended in 1919 (Acts 1919 p. 469), is in the words and figures following, to wit: "The stock of such company shall be . . . transferable in such manner as the by-laws may prescribe. Such company shall not use its funds in the purchase of stock in any other corporation except upon the written consent of all the stockholders of the company . . . in which stock is sought to be purchased: *Provided, however,* That the provisions of this act shall not apply to the purchase of stock in any other than corporations created and existing under the laws of this state."

The written consent of all the stockholders of the Vulcan to said contract between the company and the Chicago parties being the contract last herein set out,

was never given, nor did all the stockholders of said company ever give their consent thereto in any manner whatever.

On October 6, 1923, the Vulcan, in pursuance of said contract with said Chicago parties, executed and delivered to appellee Southwestern corporation, a quit-claim deed to all of said lands. On December 10, 1923, appellee Southwestern corporation brought suit against Vulcan to quiet title to said land, and, on February 14, 1924, took a judgment by default in said action against it, quieting title thereto. Suit was brought and said judgment by default was taken by appellee Southwestern Coal Corporation by fraudulent collusion on the part of said corporation and its officers with the directors and officers of the Vulcan, and for the fraudulent purpose on the part of all of said parties of making effective said illegal contract entered into by said directors of said Vulcan by said resolution on August 1, 1923, and said deed by said Vulcan to said Southwestern corporation, and for the fraudulent purpose of estopping the Vulcan and its stockholders, or any of them, from setting up and establishing the illegality of said contract and said deed, and that said contract and deed and said judgment were all a part of one transaction entered into with the fraudulent purpose on the part of the Southwestern corporation and its officers, and the officers of the said Vulcan of circumventing the law and giving effect to an illegal transaction, and the taking of said judgment was fraud upon the court as well as upon the Vulcan and its stockholders.

Appellee Enos Coal Mining Company, on May 28 1924, entered into a written contract with appellee Southwestern corporation, wherein it leased to Enos Coal Mining Company all the coal and coal rights under said land, with the right to strip mine the same, in consideration of a stipulated royalty to be paid by said

lessee to said lessor. The consideration stipulated in said lease for said mining rights was wholly and unreasonably inadequate; said rights were reasonably worth at least five times as much as said lessee agreed to pay therefor, and this was well known to them and to all their officers at the time said lease was made. Said lease was fraudulently made and entered into by the lessor and the lessee, and by their officers, all in collusion with one another with the fraudulent purpose of defrauding and cheating the Vulcan and its stockholders, and was a fraud on said company and its stockholders, and in derogation of their rights.

Appellee Southwestern corporation accepted said deed, and appellee Enos Coal Mining Company accepted and entered into said lease contract with the full knowledge of all the facts hereinbefore stated.

Appellant, as receiver, offers, on behalf of said Vulcan to recognize any indebtedness which this court may find to exist in favor of appellees or any of them, and to do and perform any and all acts that the court may deem to be required in justice and equity between all parties. Appellees and each of them is claiming an interest in said lands, which is without right and unfounded, and a cloud upon the title of the said Vulcan Coal Company.

Appellees, the Central National Bank of Cleveland, formerly the Central National Bank, Saving and Trust Company, and John W. Eckelberry, as trustee to certain holders of bonds executed by appellee Enos Coal Mining Company, claim an interest in said real estate, and said claim is without right and unfounded, and they are made parties to answer as to their interests.

At the time of said meeting on January 29, 1923, one Lucinda Roberts was a stockholder of said Vulcan company and ever since has been and now is said stockholder, and she had no notice of said meeting of said stockholders, and was not present or represented by

proxy, and has at no time consented to the agreement that was at that time entered into or attempted to be entered into by said Vulcan and said Chicago parties; she has at no time consented to said agreement or purported contract, and, before the bringing of this action, she demanded of appellant that it bring this action for the purpose of recovering the assets of said Vulcan company so unlawfully and wrongfully transferred or attempted to be transferred by said directors of the Vulcan company to appellee Southwestern corporation. At no time have all the stockholders of the Vulcan company given their written consent to the investment of the assets of said Vulcan company in the stock of appellee Southwestern corporation, and said Roberts at no time gave her written consent to the investment, and the stockholders of appellee Southwestern corporation have not given their consent to the investment of the assets of the Vulcan Coal Company in the stock of said Southwestern corporation.

Appellant prays that said deed and said lease be declared null and void, and that the contract of January 3, 1922, and the contracts of May 12, 1922, and the contract of August 1, 1923, between the Vulcan company and the Chicago parties, each be declared null and void, and that the said judgment be set aside and held to be null and void, and that the court determine the indebtedness, if any, on the part of said Vulcan company to appellees, and each of them, and that the title of said Vulcan Coal Company to said lands be quieted as to all of appellees, and for all other proper relief.

It is appellee's contention that appellant, as receiver of the Vulcan Coal Company, cannot maintain this action, but, as it seems to us, if the action can be maintained at all, it can be brought by the receiver of the Vulcan Coal Company, and by such receiver alone without joining with him the persons for

whose benefit the action is brought. Section 259 Burns 1926, provides that: "An executor, administrator, a trustee of an express trust, or a person expressly authorized by statute, may sue without joining with him the person for whose benefit the action is prosecuted." Section 1312 Burns 1926 provides that: "The receiver shall have power, under control of the court, or the judge thereof in vacation, to bring and defend actions . . . in his own name, and generally to do such acts respecting the property, as the court or judge thereof may authorize." It is expressly averred in the complaint that appellant was authorized by the court to bring this action. As such receiver, he was in charge of all the property and rights of the company, and, in bringing this action, he was, while representing the corporation, through it acting for the benefit of the stockholders and creditors.

In *Coddington* v. *Canaday* (1901), 157 Ind. 243, 61 N. E. 567, the action was by the receiver of a bank to recover against its directors for mismanagement, and it was contended that such receiver could not maintain the action, but the court, in answer to the contention, said: "The order appointing the receiver for the Citizens Bank authorized him to take charge of, and reduce to his possession, all the property, rights, credits, demands, and choses in action of every description, and however arising belonging to the bank. It empowered him to bring and prosecute in his own name, as such receiver, all actions necessary in the discharge of his duties, 'whenever in the judgment of said receiver it would be proper to bring and prosecute any such proceeding or suits.'

"The statute of this State does not attempt precisely to define the powers of a receiver appointed by virtue of its provisions, but indicates, rather, their general scope and object. Among the ends to be attained by a

general receivership are the seizure of property in the hands of defendant, the recovery of such property as has been illegally transferred and for which a suit or action may be maintained," etc.

That Lucinda Roberts could have brought the suit as a stockholder, for and on behalf of the corporation, and all of its creditors and stockholders, had the corporation itself, or its receiver refused to do so, is well settled. The rule that controls under such circumstances is thus expressed in 6 Fletcher, Corporations p. 6901: "Nothing, therefore, is now more surely settled in the law of corporations than the doctrine that any unauthorized act or contract by the directors or a majority of the stockholders of a corporation, which will destroy the existence of the corporation or render it unable to perform its functions, or any misapplication or diversion of assets to purposes not authorized by its charter, even though all other stockholders may consent, is a breach of trust towards a dissenting stockholder, against which he is entitled to relief in equity. Therefore, in the absence of estoppel and if he cannot obtain relief through the corporation or its officers, any stockholder may maintain a bill in equity in his own name to enjoin a waste, misapplication or diversion of its assets, or to enjoin or set aside ultra vires acts or contracts which will result in such a waste, misapplication or diversion, or which may destroy the corporation or render it unable to carry out its objects."

It was incumbent upon her, of course, first to seek relief by demand upon the officers of the corporation, or, as in this case, upon the receiver, to bring the action, and then, upon its refusal to act, she could sue. In *Carter* v. *Ford Plate Glass Co.* (1882), 85 Ind. 180, it was held that the theory upon which the stockholder was permitted to sue was that the company, whose duty it was to bring the action, was in the hands of its ene-

mies, and therefore could not sue, and so here, it may be said that the company was in the hands of its enemies, and that its officers, if it may not be said that they conspired with others in acts prejudicial to the rights of stockholders, at least acquiesced therein. Pursuing her remedy in regular course, Lucinda Roberts made her demand upon the receiver that he bring suit, and thereupon the receiver, with the authority of the court, complied with the demand.

But representing the Vulcan company as he was, he could only maintain such action as the company could have maintained, had a receiver not been appointed. And this brings us to a consideration of the second question presented—as to whether, under the circumstances here involved, the Vulcan company could have maintained the action. It is appellee's contention that it could not, appellant's contention, of course, to the contrary.

The Vulcan Coal Company was organized under the Mining and Manufacturing Companies Statute, being §5496 *et seq.* Burns 1926. Section 5514 Burns 1926, being §7 of the original act as afterward amended, provides: "The stock of such company shall be deemed personal estate, and, when fully paid in, shall be transferable in such manner as the by-laws may prescribe. Such company shall not use its funds in the purchase of stock in any other corporation except upon the written consent of all the stockholders of the company desiring to purchase said stock, and also the written consent of all the stockholders of the corporation in which stock is sought to be purchased: Provided, however, That the provisions of this act shall not apply to the purchase of stock in any other than corporations created and existing under the laws of this state."

It is averred in the complaint that at no time did any of the stockholders give their written consent to the

purchase of any of the stock of the Southwestern Indiana Coal Company, and that certain of the stockholders, including Lucinda Roberts, were not notified of meetings of the stockholders at which steps were taken which eventually culminated in the transfer of the Vulcan company's funds or assets to the Southwestern Indiana Coal Company, in exchange for 49 per cent of the stock of the new company, the Chicago parties retaining 51 per cent to themselves, for which, it appears, they gave no consideration whatever. It is well established that the general statute under which a corporation is organized must be regarded as entering into and forming a part of the articles of incorporation. *State, ex rel.,* v. *Anderson* (1903), 31 Ind. App. 34, 67 N. E. 207. As stated in *Bent, Rec.,* v. *Underdown* (1901), 156 Ind. 516, 60 N. E. 307: "The charter of a corporation formed under a general law consists of its articles of association and the law under which it is organized."

The language of the statute quoted is mandatory that: "Such company shall not use its funds in the purchase of stock in any other corporation except upon the written consent of all the stockholders." This consent, by the allegations of the complaint, the company did not have, and without it, it must be held that its acts in making such exchange were void. It is not the duty of the courts to explain away the plain provisions of statutes, but rather to give them the force and effect evidently intended by the Legislature, which, in this case, must have been to protect minority stockholders from transactions such as here. We agree with appellee's contention that the Vulcan company had the power to acquire stock in another corporation, but it had that power subject to the express conditions named in the statute, and not in spite of such conditions. *Brownlee* v. *City of Princeton* (1926), 198

Ind. 148, 152 N. E. 828; *Crittenberger, Aud.,* v. *State, etc., Trust Co.* (1920), 189 Ind. 411, 127 N. E. 552; *Ramsey* v. *Yount* (1918), 68 Ind. App. 378, 120 N. E. 618, *Wilson* v. *Sentman* (1920), 74 Ind. App. 112, 121 N. E. 669, 127 N. E. 864.

Appellee argues that, even if the acts complained of were *ultra vires,* since they had been fully performed, neither the corporation nor the receiver of the corporation can successfully rely upon the defense of *ultra vires.* But such is not the law in Indiana, where, as here, there was an absolute want of capacity to act, such acts being in contravention of the statute, and of its charter, of which the act was a part. The following Indiana cases announce the rule by which we are controlled.

In *Board, etc.,* v. *LaFayette, etc., R. Co.* (1875), 50 Ind. 85, an Indiana railroad company had leased the western division of its road to an Illinois company for a period of 99 years. This lease was made by the directors without the consent of the stockholders. The plaintiffs, as stockholders in the Indiana company, sued to annul the lease. The court held that the lease was *ultra vires* and void, saying: "It is also claimed by the appellees that, if the contract was originally *ultra vires* the corporation, the parties complaining of it have acquiesced in its terms such a length of time, received benefits under it, and confirmed it by so many acts, that they are now estopped from questioning its validity. A contract *ultra vires* the charter is void, and cannot be made valid by any subsequent act of the corporation, because there is no residuary power to confirm it. What they could not make, they cannot confirm. A void act cannot ever become valid, merely because it remains unquestioned."

In *Leonard* v. *American Ins. Co.* (1884), 97 Ind. 299, the insurance company was authorized to issue fire in-

surance policies in cases where the insured had a title in fee simple and unincumbered. The company insured plaintiff's property against fire. There was a judgment lien on his property at that time. A suit was brought on the policy and the company set up the answer that it had no authority to execute a policy on insured's property, as it was incumbered by these judgment liens, and its charter only authorized it to insure unincumbered property. The insured replied that the company knew of these liens and, therefore, waived this provision. The court held that a corporation cannot waive a provision in its charter, and that the policy was void.

In *Franklin National Bank* v. *Whitehead* (1898), 149 Ind. 560, 49 N. E. 592, 39 L. R. A. 725, 63 Am. St. 302, a corporation had entered into an *ultra vires* contract with a bank. The bank claimed that the corporation was estopped to set up its lack of authority to do the act. The court held that the bank had full knowledge of the corporation's lack of authority, and the doctrine of estoppel did not apply, saying that: "Besides, the doctrine urged does not apply to contracts where the same are forbidden by statute or are contrary to public policy."

In *State Board, etc.,* v. *Citizens St. R. Co.* (1874), 47 Ind. 407, 17 Am. Rep. 702, a corporation had made an *ultra vires* contract with a third party, and, in a suit against this third party, the defense of *ultra vires* was set up by the third party. The court said: "A distinction may, perhaps, be well made between the case where an act of a corporation is done in violation of an express prohibition in its charter, or in some other law relating thereto, and the case where there is simply a defect of power in the corporation to do the act." Then holding that the third party was estopped to set up the defense of *ultra vires,* the court said: "It is not claimed in the case under consideration that there was any statute by

which the street railway company was prohibited from entering into the contract in question, or in other words, that in making the contract that company violated any statute by which the act was prohibited. All that is claimed is, that there was a want of power on the part of the corporation to bind itself by the contract."

In *Pancoast* v. *Travelers Ins. Co.* (1881), 79 Ind. 172, the court said: "Although there may be a defect of power in a corporation to make a contract, if a contract made by it *is not in violation of the charter of the corporation, or of any statute prohibiting it,* the contract will be enforced against the corporation." (Our italics.)

In *Wright* v. *Hughes* (1889), 119 Ind. 324, 21 N. E. 907, 12 Am. St. 412, an Indiana corporation was authorized to do life insurance business. Its business became unprofitable, and it bought up its life policies with the intention of going into the accident insurance business. To accomplish this purpose, it borrowed money from the Northwestern company and mortgaged its property to secure the loan. The Indiana company became insolvent, a receiver was appointed, and one of its policy holders brought the action to have the mortgage declared void, on the grounds that the company had no authority to change from a life insurance company to an accident insurance company, and that its act of borrowing the money for that purpose was *ultra vires.* The court said: "However this may be, *since there was no statute prohibiting the company from purchasing its outstanding policies, or from borrowing money for that purpose,* and the transaction was not intrinsically illegal or immoral, the bond and mortgage given to secure the loan of money to be used in taking up the policies were not void." (Our italics.) The court further said: "In such a case, although the lender may know that it is the purpose of the borrower to use the money in an irregular way, *yet if the contract between the lender and the*

*borrower is not in violation of the law, or declared void by statute,* the money may be recovered, unless the lender was in some way implicated in furthering the borrower's design, or accessory to the prohibited or illegal act." (Our italics.)

In *State Life Ins. Co.* v. *Nelson* (1910), 46 Ind. App. 137, 92 N. E. 2, the court said: "Where a corporation enters into a contract which is beyond its power, *but not in contravention of a statute or against public policy,* it cannot, as a general rule, after such contract has been performed by the other party, set up its own lack of power. (Authorities cited.)

"It most certainly cannot, *as a defense* to a suit brought by the other party to rescind, set up its own lack of power to make a contract *not in contravention of a statute nor against public policy."* (Our italics.)

In *Huntington Brewing Co.* v. *McGrew* (1916), 64 Ind. App. 273, 112 N. E. 534, the court said: "Any act done or agreement made by a corporation, by and through its proper and duly authorized officers with an honest view of serving corporate ends in a substantial sense *which act is in itself lawful and not prohibited by charter or otherwise,* will be considered within the corporate powers as against an after-claim of such corporation that such act is *ultra vires."* (Our italics.)

By these authorities it is clearly established in Indiana that a corporation cannot be estopped to deny its lack of power to do an act when the act is in contravention of a statute or provision in the corporation's charter. The act of the Vulcan Coal Company in conveying its property for stock in the Southwestern Coal Company, being inhibited by statute, except by the written consent of all of the stockholders, was absolutely void, and the company had no capacity to do this act, unless there was such consent by all the stockholders. Other authorities to the same effect are: *Vail* v. *Ham-*

*ilton* (1881), 85 N. Y. 453; *Leffert* v. *Jackman* (1919), 227 N. Y. 310, 125 N. E 446; *Cyclone Drill Co.* v. *Zeigler* (1918), 99 Ohio St. 151, 124 N. E. 131; *Commerce Trust Co.* v. *Chandler* (1924), 295 Fed. 241; *Williams* v. *Graylord* (1902), 186 U. S. 157, 22 Sup. Ct. 798, 46 L. Ed. 1102; *Southern, etc., Loan Assn.* v. *Casa Grande Stable Co.* (1900), 128 Ala. 624, 29 So. 654.

It is to be observed that it is averred in the complaint that appellee Southwestern Coal Company knew all the facts alleged in the complaint when it accepted the deed, and that appellee Enos Coal Company knew all such facts when it entered into the lease. Neither company, therefore, is in a position to claim an estoppel, for neither company was in any way misled. *Franklin National Bank* v. *Whitehead, supra; Leonard* v. *American Ins. Co., supra.*

It is averred in the complaint that the Chicago parties had invested $176,000 in the enterprise, and then that they received mortgages against the property for the full amount of this investment. It thus appears that the 51 per cent of the stock of the Southwestern company received by these parties was wholly without consideration, and this was a controlling interest in the company. There must have been some suspicion in the minds of the parties as to the legitimacy of such a deal as this; at any rate, we are frank to say that we are wholly unable to see the equity resulting therefrom to the stockholders of the Vulcan company not consenting thereto. The contracts were in due form, and executed by the proper parties, the descriptions of the real estate involved were unchallenged, and there seems to be no question that the quit-claim deed executed by the Vulcan was in its appearance regular. Yet, appellee Southwestern company deemed it necessary to bring an action to quiet its title as against the Vulcan and others, and the officers of the Vulcan,

whose duty it was to protect the rights of all the stock-holders, allowed the company to be defaulted, and the title to be quieted. Such procedure justifies the averment that there was collusion in the whole transaction, including the bringing of the action by the Southwestern company to quiet title. In 34 C. J. page 474, the rule is stated, with authorities to sustain it, that: "Equity will restrain the enforcement of a judgment which was unjustly obtained by means of a conspiracy or fraudulent collusion."

We have already held that the contract executed under the conditions above set out was *ultra vires,* as being in contravention of a statute. It is the law that a judgment founded upon an *ultra vires* contract is no better than the contract itself and is therefore void. In 14a C. J. page 335, it is stated that: "It has been held that a judgment by consent obtained on an ultra vires contract, the question of ultra vires not having been raised either in the pleadings or in the facts stated, is of no more validity than the invalid contract on which it is founded." The author sustains this statement of the law by citing *Great Northwest Cent. R. Co.* v. *Charlebois* (1896), 26 Can. S. C. 221, 12 Can. R. App. Cas. 94, where, at page 124, the court states: "It is quite clear that a company can not do what is beyond its legal power by simply going into court and consenting to a decree which orders that the thing shall be done." The default of the Vulcan company, under the circumstances of this case, amounts to no less than its consent to the judgment quieting title.

In *Cotterell, Admr.,* v. *Koon* (1898), 151 Ind. 182, 51 N. E. 235, it was held that an attack upon a judgment on account of fraud or collusion in its procurement is not regarded as a collateral attack. In that case, a father whose minor children, mere babes, were living with him, brought an action against

them to quiet his title to certain real estate in which they had an interest. He caused a summons to be served on them and they were defaulted. A guardian *ad litem* was appointed, who, after filing a formal answer in denial, gave the case no further attention, and judgment was rendered quieting title as against the children. In an action to set aside this judgment, the court stated that it was the duty of the father, having custody of his children, to see that they were not deprived of their rights by his own wrongful conduct, and further that he owed a duty to the court, in which the cause was pending, to create no misapprehension in the mind of the court as to the adversary character of the cause. The judgment was set aside and vacated. So here, the officers of the Vulcan company, as well as of the Southwestern company, owed a duty to the stockholders of the Vulcan, fully to protect their interests, and failing so to do, and permitting a judgment to be rendered against their equities, the same should be set aside.

The judgment is reversed, with instructions to the court to overrule the demurrer to the complaint and for further proceedings in harmony with this opinion.

### ON PETITION FOR REHEARING.

NICHOLS, J.—On rehearing, appellees undertake to present that §5514 Burns 1926, cited and quoted in the original opinion, is not applicable to the facts herein involved, for the reason that the corporation was at the time insolvent, and that the statute had no application to insolvent corporations. No such question, in this regard, as appellees seek to raise now, was presented in the original brief, and appellees thereby waived the same.

It is a well-established rule of this court and of the Supreme Court that questions not presented on the first hearing of a cause, on appeal will be deemed as waived,

and will not be considered on rehearing. Rule 22 of Supreme and Appellate Courts; Ewbank's Manual of Practice §186; *Indiana Power Co.* v. *St. Joseph, etc., Power Co.* (1902), 159 Ind. 42, 63 N. E. 304, 64 N. E. 468; *Armstrong* v. *Hufty* (1899), 156 Ind. 606, 630, 60 N. E. 1080; *Cleveland, etc., R. Co.* v. *Lindsay* (1904), 33 Ind. App. 404, 412, 70 N. E. 998; *Federal Union Surety Co.* v. *Schlosser* (1917), 66 Ind. App. 199, 114 N. E. 875, 116 N. E. 760.

Petition for rehearing denied.