HANRAHAN, Respondent, v. ANDERSEN et al., Appel-
lants; MONTANA DAKOTA UTILITIES CO., Inter-
vener.

(No. 7,880.)

(Submitted February 1, 1939. Decided April 24, 1939.)

[90 Pac. (2d) 494.]

*Mr. Wm. E. MacGregor* and *Mr. S. S. Smith,* both of the Bar of Minneapolis, Minnesota, and *Mr. D. R. Young,* for Appellants, submitted an original and a reply brief; *Mr. Smith* and *Mr. Young* argued the cause orally.

*Mr. W. B. Leavitt,* for Respondent, submitted a brief, and argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

This is an appeal from a judgment of the district court of Fallon county quieting the title of Capital Gas Corporation in two oil and gas leases, and decreeing invalid a $50,000 lien imposed against the leases by a former judgment of the same court, together with four assignments executed in consideration of such former judgment. The facts are somewhat involved, and we will at the outset give only a general outline of them, leaving the particulars to be shown during the course of this opinion.

John Wight was the organizer, promoter, director, treasurer and self-styled general manager of Capital Gas Corporation, which held oil and gas leases upon approximately 500,000 acres

of land. He then organized, promoted and attempted to finance Montana Consolidated Gas Companies, Inc., and devised and promoted a plan for the consolidation of the entire business and property of Capital Gas Corporation and two other companies by a conveyance thereof to the new corporation in exchange for its capital stock. He also organized, promoted and attempted to finance Great Northern Gas & Utility Company, which was to promote the construction of a pipe line through which the gas was to be marketed, and which apparently was to be the parent company and to control the entire project. These companies will hereinafter be termed "Capital," "Consolidated" and "Northern."

Wight and the defendant Jay A. Andersen, through whom or in association with whom he was attempting to finance Consolidated and Northern, not being successful, Wight then caused a trust deed to be made purporting to convey to Andersen, as trustee, all Capital's interest in the property it had purported to convey to Consolidated, together with the capital stock of the latter which it had received for the property. These transactions were had in 1931; during that year and thereafter most of Capital's oil and gas leases were lost through the defaults of Consolidated and Andersen.

Olive B. Gifford, a stockholder of Capital, being unable to induce the company's officers and directors to act, brought suit in 1933 to set aside as void the transfers to Consolidated and Andersen, and to get back what little was left of Capital's assets. Wight then was instrumental in the entry of a judgment finding that the allegations of the complaint were true and that the transfers were void, and quieting Capital's title to the two oil and gas leases in question, known as the Armstrong and Anders S. Anderson leases, which constituted virtually all Capital's remaining assets, but giving defendant Andersen a judgment of $50,000 with a lien on the two leases for its payment.

Subsequently, in 1933 and 1937, Wight caused four documents to be made and delivered to defendants Kelly and Equities, Incorporated, Andersen's successors in interest, in Capital's name, purporting to assign to them oil and gas proceeds from the

two leases for payment of the judgment, subject to an option to repurchase. Plaintiff Hanrahan, another stockholder, learning of these transactions in 1937, and being unable to induce the officers and directors to act, instituted this suit and obtained a judgment quieting Capital's title to the two leases, finding all the corporate transactions in question invalid and Capital not indebted to Andersen, and holding the Gifford judgment void, so far as the $50,000 judgment and lien against Capital's property was concerned. This appeal followed.

Hanrahan's complaint consists of a first cause of action to quiet Capital's title to these two oil and gas leases; and a second cause of action to set aside that part of the judgment in the *Gifford Case* giving Andersen the $50,000 judgment and lien and also to set aside the four assignments made in consideration of the judgment. His contention in the second cause of action is that the judgment is void as against Capital because Capital was not a party to it; and that the four subsequent assignments were void because made without authority and without consideration. The defendants were the four appellants, Andersen, Kelly, Smith and Equities, Incorporated, all of whom seem to be interested in the Gifford judgment and subsequent assignments, and John Wight and Capital, who were served but who defaulted. By our general references to defendants in this opinion, we shall mean the four answering defendants, who are the appellants herein.

The defendants' answer consists of a general traverse, the defense of the statute of limitations, and a defense alleging that the 1931 transfers were valid corporate acts, and that the Gifford judgment was entered pursuant to a compromise agreement by which the transfers were to be declared invalid and the property restored to Capital subject to the $50,000 lien in Andersen's favor. These defenses are directed against both causes of action; and the prayer is in effect that the defendant Equities, Incorporated, as successor in interest of the other answering defendants, be decreed the owner of the rights purported to be conveyed under the four assignments made after entry of the Gifford judgment. In his reply plaintiff put in issue

the corporate acts alleged in the answer. Montana-Dakota Utilities Company intervened and asserted that it had in good faith paid defendants for gas production under the assignments; but a stipulation was entered into between it and plaintiff to the effect that any judgment entered herein should not affect the interests of intervener.

Trial was had to the court without a jury. The record is voluminous and includes the court file in the *Gifford Case,* including pleadings, exhibits and reporter's transcribed notes, Capital's minute book, the various documents relating to all the transactions referred to, and the testimony of eight witnesses, the chief one being John Wight. The trial court found that ever since Capital's organization Wight had controlled the company, elected the board of directors, without authority designated himself general manager, completely dominated and controlled the board of directors and operated the company's affairs and properties as if they were his own; that the 1931 transfers to Consolidated and Andersen were void because of failure to comply with section 6004, Revised Codes; that Capital was not served with process, did not appear, and was not represented in the Gifford suit, and was not a party to the judgment; that issues were determined therein only between the plaintiff Gifford and the defendants Consolidated and Andersen; that the judgment entered in Andersen's favor was void as against Capital; that the assets of Capital and particularly the two leases in question never became part of the trust property, and that Andersen never had legal possession thereof; that Consolidated had reconveyed the leases to Capital; that Capital was never indebted to Andersen in any sum whatever; that Andersen had assigned his $50,000 judgment to defendant Kelly; that the four assignments of interest in and under the two leases made in Capital's name to Kelly in 1933 and to defendant Equities, Incorporated, in 1937, were made without authority either from the stockholders or the board of directors, and in consideration only of the void judgment in the Gifford suit, and that all the defendants knew at all times that the true consideration therefor was the void judgment; that Capi-

228

tal at all times had been and then was the owner of the two leases, and was entitled to the rents and profits thereof; that the claims of appellants were invalid and void and constituted a cloud on Capital's title; that plaintiff did not know of defendants' claims until June, 1937, and had filed this action in July, 1937, and that the same was not barred by subdivision 4 of section 9033, Revised Codes; that money due from intervener for gas purchased since the commencement of this action belonged to Capital, and that the $3,719.09 received by defendants for gas prior to suit was Capital's property.

The court's conclusions were that plaintiff was entitled to a decree quieting Capital's title to the two leases in question, free of any encumbrance excepting the rights of intervener under prior operating agreements, and to an accounting on Capital's behalf from the answering defendants for $3,719.09, and to judgment therefor in favor of Capital, and to an accounting from intervener under the operating agreements. Decree was entered accordingly.

Thus in quieting and removing clouds upon Capital's title to the leases, the court found invalid: (1) The attempted alienations of Capital's property to Consolidated and Andersen in 1931; (2) that part of the Gifford judgment entered in 1933 awarding $50,000 to Andersen and granting him a lien on the two leases in question; and (3) the assignments made in 1933 and 1937 in consideration of the judgment.

Twenty-two specifications of error are assigned, fourteen of which (numbered 3 to 16, inclusive) are directed against specific findings, and four (numbered 17, 18, 19 and 20) against specific conclusions. The other four specifications of error are that the court erred. (1) in overruling appellants' objections to the introduction of any evidence; (2) in failing to adopt appellants' requested findings and conclusions; (21) in rendering judgment for plaintiff and against appellants; and (22) in failing to make findings and conclusions on the issue of compromise and settlement.

With one exception, all the facts found in the court's findings were amply supported by competent evidence. The ex-

ception was the finding that Capital was not served with process in the Gifford suit; but that finding is immaterial, as will hereinafter be shown. The conclusions of law, including those stated in the findings of fact for the reason that they are of the nature of ultimate facts, such as the invalidity of the attempted 1931 transfers, the Gifford judgment as against Capital, and the attempted 1933 and 1937 assignments in consideration of the void Gifford judgment, are the main questions of law now to be considered under all specifications of error, except the first.

While the plaintiff's second cause of action did not directly attack the 1931 transfers, but relied upon the Gifford judgment as finding them invalid, the plaintiff's first cause of action to quiet title raised the entire issue of Capital's title as against the appellants' claims. As stated above, the latter in support of their claims alleged facts tending to show that the 1931 transfers were valid corporate acts of Capital. These allegations were controverted by plaintiff's reply. Thus the validity of those transactions prior to the Gifford judgment were placed in issue by the defendants and will now be discussed. The facts concerning them, as shown by the record, are as follows:

At a special meeting on March 18, 1931, Wight offered a resolution providing, among other things, for the consolidation of Capital's assets and business with those of two other companies by the organization of a ''Consolidated Company,'' and the conveyance to it of all three companies' property for all the new company's stock to be issued to each in proportions to be determined by an appraisal of its property conveyed. The minutes do not show the adoption of the resolution.

A special stockholders' meeting was called for March 24, 1931, on eleven days' notice by mail without publication, ''for the purpose of considering and ratifying'' the proposition, and ''to ratify any action of the Board of Directors * * * taken in the same matter,'' and was finally held on April 2, 1931, when a quorum is shown as present, apparently of three-fourths of the stock, though stated in the minutes merely as ''a majority of all outstanding stock.'' Not all outstanding

stock was represented. According to the minutes, Wight "offered" a long resolution referring to this and other matters and "ratifying and confirming the action of the Board of Directors taken on the 13th day of March, 1931" on the consolidation matter; the minutes state: "Motion was seconded and upon being put to a vote was carried, all present voting 'Aye.'"

Subsequently, on April 20, 1931, and on September 14, 1931, the directors authorized modifications of the consolidation agreement, and a special stockholders' meeting was called for September 19, 1931, on five days' notice by mail without publication, "to pass upon and ratify * * * certain changes in" the consolidation contract of April 2, 1931. The minutes show a quorum of more than three-fourths of the outstanding stock as present and voting for a resolution approving the modification, including plaintiff Hanrahan's stock by proxy, but 83,883 shares were not represented.

At the directors' meeting of September 14, 1931, and the stockholders' meeting of September 19, 1931, a contract already signed by Wight as "general manager" on September 11, 1931, was approved, providing for the exchange of Capital's stock in Consolidated for stock in Northern, and for the sale of the latter by Jay A. Anderson & Company. The latter's identity with appellant Jay A. Andersen is not shown, though Wight testified that from about that time he had made Andersen's Minneapolis office his own headquarters and had been closely associated with Andersen in the attempted promotions.

At a special meeting on December 30, 1931, the directors instructed the officers to sign a deed of trust dated December 29, 1931, transferring to Andersen all Capital's stock in Consolidated, and all Capital's right, title and interest in the properties theretofore conveyed to Consolidated; this was done upon Wight's representation that it was necessary to avoid receivership proceedings for Consolidated.

These are the only purported authorizations of the transfers of substantially all of Capital's assets, first, to Consolidated, and, second, to Andersen. The by-laws do not give such power to the board of directors. There is no proof in the record that

the notices of the two meetings were actually mailed to the stockholders; but it is unnecessary to decide the effect of these and other questionable points, due to the obvious failure to comply with the requirements of section 6004, Revised Codes, requiring stockholders' special meetings for the purpose of considering such disposition of corporate property to be held upon at least thirty days' notice by mailing and publication.

It is well settled that the board of directors, and not the ██ ██ stockholders, controls the conduct of the corporation's business, and necessarily controls the corporation's property with reference to all matters within and incidental to such business. (Sec. 5933, Rev. Codes; *Pioneer Minerals Corp.* v. *Larabie Bros. Bankers*, 99 Mont. 358, 43 Pac. (2d) 884; *Raish* v. *Orchard Canal Co.*, 67 Mont. 140, 218 Pac. 655.) But it is equally well settled in the absence of express statute, that in the case of a solvent corporation which has accumulated property for use in its business, neither the directors, nor even the stockholders except by unanimous vote, have the authority to dispose of such property except in the furtherance and in the ordinary course of the business; for otherwise the authority is being used to defeat, to that extent, the very purpose for which the authority was given. While the question usually arises with reference to attempted sales of all, or substantially all, of the corporate property, the limitation of power rests on the principle that such an alienation is in its essence the very negation of the corporate business. The sale of all the assets of a solvent corporation is obviously not in furtherance of and in the ordinary course of its business; and the sale of part of its assets may in a particular instance be open to the same objection.

It has been held that the directors, unless specially empowered, ██ could not sell any portion of the estate of the corporation essentially necessary for the transaction of its customary business. (2 Thompson on Corporations, secs. 1289, 1290; *Rollins* v. *Clay*, 33 Me. 132.) The reason for the rule is that the purpose of a solvent corporation and of its stockholders is not to be defeated in whole or in part by the directors, nor even by the stockholders without unanimous consent, unless expressly pro-

vided by law. (*Forrester* v. *Boston & Mont. Con. C. & S. Min. Co.*, 21 Mont. 544, 55 Pac. 229, 353.) It was to relax the rule in the latter respect so as to prevent a small minority from thwarting the will of the overwhelming majority that the statute now appearing as section 6004, supra, was enacted; and to make the relaxation of the law effective, its requirements must be essentially complied with. (*Wortman* v. *Luna Park Amusement Co.*, 61 Mont. 89, 201 Pac. 570.)

Defendants contend that these transfers to Consolidated and to Andersen do not come within the provisions of section 6004, because Capital retained its official books, records and office, and thereafter transacted business and was shown thereafter to have had other property. The argument overlooks the reason. for the rule. If the question were merely whether the corporation had other property after the transaction, no sale could ever be objected to by a minority stockholder, for in any sale other property is received as consideration. Furthermore, the statute refers to the sale of "the whole or any part" of the property. Every part of the statute must be construed as having some meaning, and since the obvious purpose of the statute was to enlarge corporate powers to sell property, it must be construed as authorizing sales not already within the powers of the board of directors because not in the furtherance and in the ordinary course of the corporation's established business. In any event it is apparent from the record that both transactions involved all, or virtually all, of the corporate assets and greatly affected the established corporate business, and therefore came well within the class of transactions necessitating compliance with the statute.

The conveyance to Consolidated was a nullity, for the stockholders' meetings purporting to authorize it were held on insufficient notice. Whether the other defects indicated in those proceedings were material need not be considered.

The trust deed to Andersen is obviously void, for it purported to convey without the slightest pretense of compliance with the statute by stockholders' authorization, not only the property supposed already to have been conveyed to Con-

solidated, but also the corporate stock of Consolidated received in the transaction. There is no question that a corporation may sell or convey its property for legitimate corporate purposes, so as to permit the carrying on of its business and the paying of its debts lawfully contracted. (14A C. J. 522, sec. 2416.) There was no pretense that Capital was in danger of insolvency or in a situation so desperate as to preclude the possibility of continuing its business, so that the question is not of the directors' enlarged powers in such situation. The representation was that it was necessary to help Consolidated to raise money so as to prevent action by the latter's creditors. Stock in a corporation threatened with receivership is hardly an asset to bolster its own credit, nor is it apparent how a deed to a trustee purporting to convey property already allegedly conveyed to the distressed corporation can help its credit. Moreover, it certainly does not appear how Capital and its stockholders could benefit from saving Consolidated by selling the latter's property from under it, or on the other hand by selling Capital's stock interest in the company to be saved. It is unnecessary to decide whether by any procedure a corporation owning stock in a second company has power to deliver its own assets to a trustee for sale and application of the proceeds to the second company's debts; or to decide whether such action is proper where, as here, the conveyance includes all of the first company's interest in the second, so that by trying to save the second it loses all interest in it. Furthermore, the trust deed to Andersen was obviously void because of failure to comply with the provisions of section 6004. It was further void as *ultra vires* the corporation, because it was utterly without consideration, and because corporations have no power to make gifts of their property, whether of all or part. (*McConnell* v. *Combination M. & M. Co.,* 30 Mont. 239, 76 Pac. 194, 104 Am. St. Rep. 703; 4 Thompson on Corporations, 3d ed., sec. 2514.)

The next question is the validity of Andersen's judgment in the *Gifford Case* as against Capital. In considering it we must bear in mind that the Gifford judgment is two-fold: First, a judgment on plaintiff's cause of action, finding the

transfers invalid and quieting Capital's title; second, a judgment on Andersen's "counterclaim" awarding him $50,000 and a lien for its payment. Here we have an unusual situation, in that plaintiff relies on the first part but asserts invalidity of the second; while defendants assert the incorrectness of the first part on the ground that the 1931 transfers were valid, but rely on the validity of the second part on the ground that the whole thing was a consent judgment. More specifically, plaintiff and respondent contend that the latter portion, Andersen's judgment, is invalid because Capital was not a party to it. Defendants and appellants, on the other hand, contend (1) that this is a collateral attack, and that the presumption of jurisdiction of the parties is conclusive unless upon the face of the judgment roll a lack of jurisdiction affirmatively appears, and that it does not here so appear; (2) that the Gifford judgment was entered by consent as a compromise settlement of the controversy, and amounts to a contract between the parties and, therefore, cannot be appealed from nor otherwise attacked; and (3) that the corporation is an indispensable party to a stockholder's suit, and that if Capital was not in fact a party, the entire judgment is void, including the part finding the 1931 conveyance void, as well as that part awarding Andersen the $50,000 and lien, so that if appellants did not obtain the lien they still owned the property. The discussion of these three arguments must of necessity be somewhat intermingled.

The defendants are correct in their contention that on collateral attack upon a judgment of a domestic court of general jurisdiction acting within its ordinary scope, the presumption of jurisdiction over the persons of the parties is conclusive, unless a lack of it affirmatively appears upon the face of the judgment roll. (*Haupt* v. *Simington*, 27 Mont. 480, 71 Pac. 672, 94 Am. St. Rep. 839; *Henderson* v. *Daniels*, 62 Mont. 363, 205 Pac. 964; *Price* v. *Skylstead*, 69 Mont. 453, 222 Pac. 1059; *Coburn* v. *Coburn*, 89 Mont. 386, 298 Pac. 349; *State ex rel. Delmore* v. *District Court*, 100 Mont. 131, 46 Pac. (2d) 39.) But the respondent's second cause of action is clearly a direct attack to obtain relief against the $50,000 judgment and lien

in the *Gifford Case,* being brought for the very purpose of impeaching or overturning it. (*Jenkins* v. *Carroll,* 42 Mont. 302, 112 Pac. 1064.) However, so far as the judgment in the *Gifford Case* in favor of Andersen is concerned, it is really immaterial whether the attack is collateral or direct, since, as will hereinafter be shown, the judgment roll affirmatively discloses the defect of the trial court's jurisdiction over Capital so far as Andersen's "counterclaim" was concerned. So that even if this were a collateral attack, defendants would be in no better position.

It is their contention that, in the absence of evidence to the contrary, we must indulge the presumption that Capital, which was named as a party defendant, was actually brought within the court's jurisdiction, the record being silent in this respect. Obviously this can be done only by presuming that the summons was served upon Capital, that it made no appearance, and that its default was duly entered. Making these presumptions, we must assume that Capital was before the court for all purposes so far as plaintiff's cause of action was concerned; but that fact would still not aid the appellants, for the presumption of jurisdiction cannot attach to the new cause of action included in Andersen's "counterclaim" or to the judgment thereunder.

Andersen's claim for $50,000 appears for the first time in his amended answer, is stated as "a further answer and counterclaim against the plaintiff," alleges services and expenses aggregating $50,000 in connection with "the trust estate described in the complaint," and seeks a judgment for that amount and a lien upon the two leases for its payment. The record shows that his amended answer, plaintiff's reply, and the stipulation for trial without a jury were all filed on August 31, 1933, and the trial was held on the same day. Obviously, all these events occurring in one day, there is no room for a presumption that the counterclaim or some other pleading was served upon Capital and that the latter defaulted with reference to Andersen's new cause of action. The only other assumptions under which the court's jurisdiction might be pre-

sumed are that defendant Capital voluntarily replied to defendant Andersen's counterclaim against plaintiff Gifford, or that defendant Andersen served and filed on defendant Capital a cross-complaint to which it immediately replied, and that, like plaintiff, Capital then stipulated for an immediate trial of the issues thereby framed, without a jury, or participated in the trial thereof without objection. If the judgment showed the consideration of such issues between the defendants Andersen and Capital we might possibly, on collateral attack, have to assume all these things in order to presume the regularity of Andersen's judgment as against Capital. But the whole record shows that his claim was not considered or treated by court or litigants as a cause of action against Capital. Both he and Capital were defendants. That no interpleading is shown by Andersen against his co-defendant Capital might be presumed on collateral attack as a mere failure to show all the record, if the judgment were shown as based upon such a cross-complaint against Capital. But the record and the judgment show that the trial was held upon a stipulation between only plaintiff and the defendants Consolidated and Andersen for immediate trial without a jury, and only "to hear the issues in said matter in so far as the said issues affect the parties to this stipulation"; the record shows, furthermore, that the court "thereupon proceeded to hear testimony in support of the allegations of the complaint and of the counterclaim or affirmative defense filed by the said Jay A. Anderson." A presumption that the court had jurisdiction of the parties as to the pleadings and issues shown to have been before the court and adjudicated in the judgment does not include the further presumption that further pleadings and issues were before the court and also adjudicated so as to comprise a judgment against another party. In other words, the presumption of jurisdiction of the plaintiff, against whom a defendant's counterclaim was directed, cannot be accompanied by the further presumption of jurisdiction over another defendant whose interests are affected and who was, therefore, a necessary party to a valid adjudication of the counterclaim, but against whom

it was not directed. The judgment affirmatively shows that it was entered after examination of the issues only as between plaintiff and the answering defendants Consolidated and Andersen, and that Capital was not even considered an interested or necessary party for the purposes of the counterclaim. Therefore no presumption can be indulged that the court had jurisdiction of it as to that issue.

Furthermore, Andersen's counterclaim clearly failed to state facts sufficient to constitute either a counterclaim or a cross-complaint. It was filed and served as "a further answer and counterclaim against the plaintiff," and not as a cross-complaint against Capital. Obviously it was not a counterclaim against the plaintiff Gifford, because it could not "tend, in some way, to diminish or defeat the plaintiff's recovery." (Sec. 9138, Rev. Codes.) While it would seem to come within the term "cross-complaint" as contemplated by section 9151, it would be one, not against plaintiff, but against Andersen's co-defendant Capital. Whether, if it had been filed and served as a cross-complaint against Capital, the facts stated would have been sufficient for the purpose is not now before us and cannot here be decided. Its allegations are so deficient in substance as conclusively to negative any counterclaim or cross-complaint against plaintiff, and the judgment based upon it was open even to collateral attack. (*Crawford* v. *Pierse,* 56 Mont. 371, 377, 185 Pac. 315; *State ex rel. Delmoe* v. *District Court,* 100 Mont. 131, 46 Pac. (2d) 39.) The judgment roll affirmatively shows that there was no substance to the second part of the Gifford judgment.

We have gone into these matters fully to show that even if this were regarded as a collateral attack upon the Gifford judgment, the presumption of jurisdiction could not aid defendants. But, as we have stated, this is a direct attack, and we are therefore not limited to the judgment roll. Both parties recognized that fact by offering other evidence.

Wight's testimony shows affirmatively that Capital was not before the court with reference to the issues of Andersen's claim, because Wight himself kept Capital from being

represented with reference to it. In this connection his entire conduct of the company's affairs as shown by the evidence and as found by the trial court is important. It is manifest that he conducted the affairs with a magnificient disregard of stockholders, directors, officers, by-laws and statutes. It is scant comfort to the minority stockholders that his attitude partly resulted from the fact that he and his family owned between sixty and seventy per cent. of the company's stock. The history of the company and its associated promotions, as shown by the record in this case, affords a perfect example of that abuse of the corporate form which unfortunately has contributed most powerfully to the prevailing criticism of our entire economic system. Naturally the losers do not distinguish carefully between defects in and abuses of the system; but if the legal safeguards are observed, the dangers of losses are greatly minimized, as the facts of this case amply demonstrate.

The usurpation of authority in this instance is unquestioned; Wight directly testified to it, not by way of admission of wrong, but as a matter-of-fact statement of assumed right. Although the company had a president, and the office of general manager was authorized neither by the by-laws nor by the directors at a valid meeting (to ignore the question whether at a properly constituted meeting the directors could have authorized it), Wight, after stating that the stock owned by him and his family gave him control of between sixty and seventy per cent., testified at the trial of this case: "Well, I feel, or I assume that I have authorities ordinarily vested in the president of the company to carry on the business in a general way." Having testified that he had run practically everything "except bookkeeping and some of the details," and having been asked whether the company's business had been run by him or by the board of directors, he replied: "I always thought I had authority to handle it. * * * Of course, I have been looking after everything, and practically independent; * * * I will admit that I just practically took charge of everything and managed like I would practically if it was my own private affairs; * * * I very seldom did have the board of direc-

tors pass on anything; * * * if it was convenient I would, and if not convenient, I wouldn't." Asked if he usually operated the business as if no board existed, he replied: "Well, I don't like to put it just in that way, but I suppose that is just what it amounted to." Asked why stockholders' meetings had not been held, he testified that he was waiting until he had "something really worth while to submit to the stockholders. Things didn't work out, consequently, I didn't think there was any use of calling a stockholders' meeting until I could get something worth while worked out;" his control of a majority of the stock "had some influence" on his failure to hold stockholders' meetings; the directors "have questioned my authority lots of times;" the company's attorney "told me lots of times that I was perhaps doing things illegal." Asked whether the board had permitted him to go ahead and run things, he testified: "Of course, it is true, I disregarded their advice and carried things on the best way I thought to carry them on;" he testified that when plaintiff's attorney inquired about these matters before filing suit, he did not make disclosure of them because: "I guess I was a little peeved, I suppose because you were making the investigation." Apparently the minority stockholders who financed the company were not even regarded as entitled to inquire where their money had gone. This general view of Wight's habitual management of the company will aid in understanding the particular transactions involved in this case.

Wight testified with reference to the Gifford suit that he and Andersen had worked together on this Consolidated promotion in Andersen's office at Minneapolis for about a year; that Andersen had expended some $50,000 in the promotion, but that not over $3,000 or $4,000 of it was actually spent on behalf of Capital and its assets, the rest of it being spent on behalf of the other consolidating companies, their assets, and the general promotion of Consolidated, and that Andersen did not "have it coming" from Capital; that he, Wight, by prearrangement with Andersen came out from Minneapolis with the defendant Smith, who was also Consolidated's and Andersen's

240

attorney, so that "I could work out some sort of satisfactory settlement with this Gifford suit so (as) to try and protect Mr. Andersen with his investment and attorney fee and one thing and another;" that the matter had been discussed at Andersen's office about a month before, and that he knew before coming out to Montana that the Andersen $50,000 judgment and lien were to be entered in accordance with "the general outline of settlement or compromise that we had sort of tentatively agreed upon;" that he consented to that arrangement because he thought it would be better to let Andersen have $50,000 back out of the Capital Gas rather than to have a long, drawn-out suit," although sixty per cent. of the property came from the other consolidating companies and was free of the judgment, and although these two leases, to be returned subject to the lien, represented only about 3,000 acres out of about 500,000 acres turned over to Consolidated and Andersen by Capital, and the other property had all been lost through their defaults, and although he knew beforehand that the judgment was also to discharge Andersen from all liability as trustee; that he did this to carry out his general obligation "to try to protect Mr. Andersen as much as I could for the obligations he had assumed in connection with the consolidated companies, and also try to get back as much for the Capital Gas as I could;" that he made no attempt to have the value of the lost property offset against Andersen's claim; that he had not told the directors that Andersen was seeking judgment for $50,000, nor consulted them upon the case because "I figured if I took it up with the rest of them, they perhaps wouldn't approve of it—they perhaps might hold up our deal;" that he did not have the company's attorney at the trial because "I suppose, in the first place, that he perhaps, wouldn't approve legally of the things I was trying to work out, and I thought we could work this thing out ourselves, and I figured the fewer people we had in the thing the better, perhaps, it would be to work it out." Asked, "Was that the reason you did not have the Capital Gas Corporation represented here at the trial?" (of the Gifford suit), he an-

swered, "I presume it is." He also testified that he did not report the judgment afterward to the stockholders or directors, but "just talked with one or two or the individuals, is all,"—whether directors or not he failed to state.

Appellants contend that upon this showing Wight represented Capital under a directors' resolution purporting to give him generally "all the powers granted by the by-laws to the president of this corporation whenever he is absent from the City of Billings, Montana," and under resolutions adopted at directors' meetings in February and April, 1933, directing "the officers" to institute any action for the purpose and to compromise the same. But the first was adopted at a meeting at which no quorum was present (to waive the further serious question whether in any event the directors had that power); and certainly Wight alone did not legally constitute "the officers." Furthermore, he testified that he ignored the directors' demand and did not permit the filing of suit by the company, but did not disclose his attitude to the directors at the meeting because he did not want to antagonize them openly.

Authority is further claimed for Wight through a resolution appearing on the back of the last page of the directors' minutes of February 3, 1933, purporting to authorize Wight to make settlement with Andersen, Smith and one Malmburg on the basis of assigning to them a portion of gas production until the full payment of such amounts as might be agreed upon by Wight; but it appears after the approval signature of the secretary, is not shown as part of the minutes of any meeting, and is the only item in the entire minute book appearing on the back of a page; in any event it does not say what is to be settled with Andersen, and the contemplated settlement with Smith and Malmburg was apparently to be for attorneys' services.

In this state of the record it cannot be found that Wight had authority to represent Capital at the trial, or that he did represent it. This disposes of the appellants' contention that the judgment was entered by consent and cannot, therefore, be attacked. The consent was clearly not Capital's consent.

Furthermore, although an appeal does not lie from a consent decree (*Corby* v. *Abbott*, 28 Mont. 523, 73 Pac. 120; *Interior Securities Co.* v. *Campbell*, 55 Mont. 459, 178 Pac. 582), the question of appealability has no bearing upon the question of the validity or nullity of the judgment. (*State ex rel. Delmoe* v. *District Court*, supra.)

Finally, as hereinbefore shown, the trust deed was *ultra vires* the corporation, and a consent decree obtained on an *ultra vires* contract is of no more validity than the invalid contract on which it was founded (*Mercantile Commercial Bank* v. *Southwestern Indiana Coal Corp.*, 93 Ind. App. 313, 169 N. E. 91, 171 N. E. 310; 14A C. J. 335, sec. 2176), since obviously a corporation cannot extend its own legal powers by going into court and consenting to a decree which would recognize the invalid act or any rights under it. Andersen's claim was based entirely on the *ultra vires* trust deed.

Appellants' final contention with respect to the judgment in the Gifford suit is that Capital was an indispensable party, and that, if it was not brought in as such, the entire judgment, and not merely the Andersen award and lien, was void, so that it did not serve to set aside the 1931 conveyances.

In all suits brought by a stockholder in behalf of the corporation and for its benefit, the corporation is a necessary party, either plaintiff or defendant. (*McConnell* v. *Combination M. & M. Co.*, 30 Mont. 239, 76 Pac. 194, 104 Am. St. Rep. 703; *Kleinschmidt* v. *American Min. Co., Ltd.*, 49 Mont. 7, 139 Pac. 785; 13 Am. Jur. 510, sec. 466; 51 L. R. A. (n. s.) 123; 97 Am. St. Rep. 45.) This is clearly so because (1) the rights of the plaintiff are dependent on establishing the corporation's rights; (2) defendant is entitled to a decree which will bind the corporation and will thus conclude the matter in controversy from further litigation; (3) the corporation is entitled to notice so as to have the opportunity to represent its own interests. We have been unable to find any exception to this rule. However, as shown above, the presumption of jurisdiction over Capital, with reference to plaintiff's cause of action, was

not overcome, and it was only with reference to Andersen's counterclaim that no such presumption obtained. The defect in that respect did not affect the validity of the decree setting aside the invalid transfers.

The next question relates to the transactions subsequent to the Gifford judgment. As above stated, Wight testified that he did not report the judgment to the directors, and the corporate minutes are entirely silent with reference to it and to the subsequent transactions. However, on November 20, 1933, Wight had the vice-president and secretary execute and deliver to the defendant Kelly, then the holder of Andersen's judgment, Capital's purported assignment of one-half of all gas and oil production from the two leases, until such time as the $50,000 judgment had been paid. Subsequently, on March 19, 1937, John Wight, as general manager, with his brother as secretary of Capital, executed and delivered to the defendant Equities, Incorporated, then and now the owner of Andersen's judgment, Capital's purported assignment of the same one-half of the production from the Anders S. Anderson lease, as an absolute assignment, stating that "it is now the purpose and intention of the undersigned to waive" the reversion contained in the assignment of November 20, 1933. At the same time they executed and delivered to defendant Equities, Incorporated, the company's purported assignment of all the proceeds of the Armstrong lease "as a substitute for a previous assignment" (the one-half proceeds assignment of November 20, 1933), to terminate automatically on January 10, 1940. At the same time other documents were executed which need not be discussed, except that Wight testified that one of them, an option to buy back the assignments, could not possibly be exercised by Capital unless he could obtain further financing.

The record discloses without question that these various assignments were made solely in consideration of the void Gifford judgment. Appellants contend that the directors had authorized them by the proceedings referred to above. While that contention would seem to be untenable, we will not discuss it for the reason that no valid consideration existed for the as-

244

signments and that, since the corporation had no power to convey its property to appellants without consideration, any purported authorization by the directors would have been meaningless.

We have saved until the last the questions as to plaintiff's right to relief, because they are several and are based upon various fact situations. Defendants contend that, as plaintiff did not offer to restore everything of value received in the transactions attacked, his complaint failed to state a cause of action, and that defendants' objection to the introduction of any evidence should have been sustained.

It is well settled that in a stockholder's suit in behalf of the corporation, he need make no offer to restore, for, not having himself received anything, there is nothing within his power to restore. (*Anderson* v. *Scandia Min. Syndicate*, 26 S. D. 558, 128 N. W. 1016; *Edwards* v. *Mercantile Trust Co.*, (C. C.) 124 Fed. 381; *Stebbins* v. *Perry County*, 167 Ill. 567, 47 N. E. 1048; *McDermont* v. *Anaheim Union Water Co.*, 124 Cal. 112, 56 Pac. 779; 6 Thompson on Corporations, 3d ed., sec. 4578, and cases there cited.) Obviously, it is not the stockholder, but the corporation, which must make whatever restoration, if any, the court may find equitable and upon which it may therefore predicate relief.

Defendants contend, also, that the plaintiff was estopped or was guilty of laches, or was barred by the statute of limitations; but the record shows without contradiction, and the trial court expressly found, that he first learned of the defendants' claims about June 1, 1937, and filed action on July 14, 1937. There is no showing that by reason of his forty-four days' delay defendants changed their position for the worse. It is clear, therefore, that plaintiff was barred neither by laches, estoppel nor the statute of limitations.

Defendants argue that plaintiff was guilty of laches in that he knew of the 1931 conveyance to Consolidated, and waited nearly six years before attacking it; but the objection is not tenable for the reason that he did not attack it in this action, and had no reason to do so, since the Gifford judgment had

already disposed of it. He accepted the Gifford judgment as holding the 1931 transfers void, and attacked only Andersen's $50,000 award and the subsequent assignments made in consideration thereof. The only reason the 1931 transfers came in issue here was because the appellants pleaded them as valid corporate acts by Capital in an attempt to avoid the effect of the Gifford judgment as simply a judgment, and to show that the latter was entered and really constituted an agreed compromise of litigation and could not be attacked. Their own proof conclusively showed that the transfers were void, and they cannot avoid the effect of their evidence by contending that plaintiff could not have attacked the transaction. The defense of laches is a shield and not a sword.

The same is true of defendants' contention that plaintiff was estopped 'to attack the transfer to Consolidated, because the record shows that at the invalid stockholders' special meeting held on September 19, 1931, he was represented by proxy and his stock was shown as voting for an amendment of the contract with Consolidated; and because he was present in person at the stockholders' annual meeting on January 21, 1932, the minutes of which show that "Minutes of the previous stockholders' Meetings were read by the Secretary, and upon motion by Mr. Mund, seconded by Mr. Butler and Mr. Hanrahan, the minutes were approved, all present voting 'Aye.' " Whether under these facts plaintiff would have been estopped to attack the attempted disposition of Capital's assets to Consolidated need not here be determined, due to the facts shown in the preceding paragraph, and the further fact that the adjudication of its invalidity by the Gifford judgment is in full force and effect.

The judgment appealed from is affirmed.

ASSOCIATE JUSTICES MORRIS, ANGSTMAN, STEWART and ERICKSON concur.

Rehearing denied May 26, 1939.