## NORTHERN MINING CORPORATION v. TRUNZ.

### No. 9737.

Circuit Court of Appeals, Ninth Circuit.

Dec. 10, 1941.

R. Lewis Brown, of Butte, Mont., and Leon R. Jacobs, of Jamaica, L. I., N. Y., for appellant.

Gavin McNab, Schmulowitz, Aikins & Wyman, Nat Schmulowitz, Oliver B. Wyman, and Walter S. Rountree, all of San Francisco, Cal., R. F. Gaines, of Butte, Mont., and Gibson & Smith and Vard Smith, all of Livingston, Mont., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

This suit was commenced by Max Trunz, appellee here, plaintiff below, against Northern Mining Corporation and others to quiet his title to certain mining claims. The case comes to this court upon an appeal by Northern Mining Corporation from a judgment of the District Court of the United States for the District of Montana. The following is a statement of the pertinent facts, predicated upon the findings of the District Court:

Prior to August 6, 1932, the mining claims involved in this case were owned in fee simple by one Peter H. Branser, who on that date contracted to sell them to the Glengarry Mining Company for the sum of $33,500 any time before October 1, 1933. A copy of this agreement, together with a deed for the claims, was deposited in a Montana bank to be delivered to Glengarry or its assigns upon full payment of the amount mentioned therein. The agreement provided that "time is expressly made of the essence of this contract." In case of failure of Glengarry or its assigns to meet the payment, as provided in said agreement, the same was to be canceled and the deed was to be returned to Branser.

On November 3, 1933, Glengarry being in default in its performance of the terms of said agreement, Branser brought an action in the state court of Montana for its cancellation; for the recovery of the possession of said mining premises; for damages; and to restrain Glengarry from mining and working the said claims. On January 15, 1934, during the pendency of that action in the state court, it was stipulated and agreed between Branser, as party plaintiff, and Glengarry, as defendant, that for the consideration of $10,000 paid to Branser and ten thousand shares of the Mining Company stock delivered to him the Mining Company was to have until July 1, 1934 (July 2 in legal contemplation, since the first day of July was a Sunday), within which to buy the Branser property for the further cash consideration of $25,-000; that an order theretofore issued restraining the Mining Company from mining operations should be vacated; that the parties to the stipulation released claims, one against the other; that time was of the essence of the stipulation; and that if the Mining Company failed to make the specified payment on or before July 1, 1934, Branser would be entitled to a default judgment for the return or surrender of possession of the premises without further proceedings. The stipulation did not make any provision for assignment by Glengarry of any interest.

It is to be noted and kept in mind with respect to this stipulation that at the trial of the instant case it was admitted by appellant that it had been entered into upon behalf of Glengarry with the latter's complete authority.

On June 28, 1934, Glengarry was without money or means with which to make the payment which would become due to Branser on July 2, 1934, and its right to secure the delivery of the deed provided for in the stipulation agreement was about to be forfeited. Its finances were in such condition that it could not borrow the necessary funds. In these circumstances Martin R. Guenzel, the president, and Maxfield Keck, a director of Glengarry, with the purpose of gaining another opportunity to acquire title to the mines went to Trunz and proposed to him that he enter into an arrangement with Glengarry so that he would pay Branser the $25,000 and acquire the title in fee simple to the claims in suit and that upon the title vesting in Trunz he would agree to give Glengarry an option to acquire the property upon stated terms. To effectuate this purpose and understanding an agreement between Glengarry Mining Company of the first part and Max Trunz, appellee herein, of the second part was executed by the respective parties. The agreement refers to the stipulation in the suit pending in the state court and also recites the fact that Glengarry does not have sufficient funds to pay the $25,000 to Branser and, further, that if the appellee, Trunz, will pay this amount to Branser and obtain delivery of the deed deposited in escrow by him, that Glengarry will immediately deliver to Trunz its deed to the same premises. The agreement further provides that if Glengarry prior to October 1, 1934, raises not less than $25,000 additional capital or such larger sum as may be necessary to pay for a flotation mill, or its equivalent, for

the concentration of ores, having a capacity of not less than twenty-five tons per day, such mill to be in operation prior to October 1, 1934, and, further, pays its current debts, Trunz agrees to give to Glengarry an option to purchase the property for the sum of $30,000 or, at his option, 100,000 shares of the stock of Glengarry, such sum to be paid or the shares to be issued and delivered on or before July 1, 1935. The writing is signed "Glengarry Mining Company by Martin R. Guenzel, President, Carl H. Keck, Treasurer, Max Trunz."

Pursuant to the agreement Trunz paid the $25,000 to Branser, received the deeds from Branser and Glengarry, whereby fee simple title to the claims was vested in appellee, and both deeds were placed on record in the proper office on July 3, 1934. At all times since, Trunz has paid the taxes accruing against said claims.

On October 31, 1934, appellee Trunz, in writing, granted to Glengarry the right to enter upon the claims for the purpose of searching for gold ore and conducting mining operations for a period ending September 30, 1935.

The evidence reveals many unsuccessful efforts made by Glengarry to procure money to fulfill the conditions precedent which would entitle Glengarry to secure the option from appellee, all without success. The testimony also shows that in attempting to operate the property Glengarry borrowed money from one Crone, who later, on June 23, 1936, obtained a judgment for the amount of the indebtedness, upon which an execution was issued on July 28, 1936. Property was levied upon, which included "all the right, title, and interest of the Glengarry Mining Company in and to those certain lode mining claims," particularly describing those involved in this suit. The property was sold to Seth A. Crone, the judgment creditor, who was the highest and best bidder. On September 1, 1937, one Birkel, a stockholder of Glengarry, as such and for himself and all other stockholders who wished to contribute, paid $16,291.17 to redeem the property, and thereafter obtained a sheriff's deed, likewise conveying "all the right, title, and interest of Glengarry Mining Company in and to those certain lode mining claims," more particularly described. Thereafter, March 31, 1938, Birkel deeded the property to appellant. Although Birkel in the redemption proceedings claimed to be acting in behalf of the stockholders of Glengarry, the deed he gave to appellant has no restrictions, and it here claims absolute title in itself, not only adverse to appellee but to Glengarry as well.

Appellant makes some claim that the transaction, as evidenced by the writings and the deeds, constituted in fact a mortgage; that appellee on occasions referred to the money paid to Branser as a loan. On this point the evidence is in conflict; but there was never any agreement by Glengarry to repay the money, and no note or other evidence of indebtedness was ever given by it to appellee. In this regard the District Court found:

"That the defendant Glengarry Mining Company, a corporation, has never at any time, or at all, requested of the plaintiff, Max Trunz, that he give it an option to purchase the mining premises involved in this action, and hereinbefore particularly described, or any part or portion of the same;

"That neither the said sum of Twenty-five Thousand Dollars, so paid by the plaintiff, Max Trunz, to said Peter H. Branser, as aforesaid, nor any part thereof, or any sum of money whatsoever, has ever been paid, offered or tendered to the plaintiff, Max Trunz, by the defendant Glengarry Mining Company, a corporation;"

The court also found:

"When the plaintiff, Max Trunz, paid to said Peter H. Branser the sum of Twenty-five Thousand Dollars, with his own money, at Livingston, Montana, on July 2, 1934, * * *, it was not thought, agreed or intended by the plaintiff, Max Trunz, and the defendant Glengarry Mining Company, a corporation, or either of them, that the defendant Glengarry Mining Company, a corporation, would return to the plaintiff, Max Trunz, at a future time a sum equivalent to that which he paid to said Peter H. Branser;"

On the point here discussed the trial court is supported by the recent holding of the supreme court of Montana in the case of Rae v. Cameron, 114 P.2d 1060, decided June 5, 1941, which was after the decision of the District Court in this case. We quote from pages 1063, 1064 of 114 P.2d:

"In disposing of this cause, we do so after having had the advantage of reargument of counsel on rehearing. At that time, emphasis was centered particularly on the proposition that the agreement contemplated no more than a loan transaction.

With this contention we cannot agree, chiefly because of the contingent circumstances set forth in the agreement under which reimbursement was to be made for funds advanced, and the general tenor thereof as well. Without extended comment on that phase of the matter we content ourselves with the following quotation from Volume 38 C. J., page 127: 'A loan is temporary, a temporary letting for a temporary use. It is an essential and characteristic feature of a loan that it be returnable. The borrower expressly or impliedly promises to return the thing loaned. The word "loan" implies an obligation to repay. From the use of the term in its ordinary signification, the law implies a promise to repay. If the obligation to return is based on a contingency or on a certain condition which may or may not happen or occur, the transaction is not a loan. * * *' "

### As To Other Assignments Of Error

The court refused to permit witness Lillian K. Symonds, assistant secretary of Glengarry, to testify whether or not prior to July 2, 1934, any special, or any meetings had been called and held for the purpose of authorizing its officers to sell or mortgage the mining claims in question to Max trunz or anyone else. The witness had indicated that she was basing her knowledge upon her examination of records, of which she claimed to be the custodian; the court inquired as to where the original records were and whether the witness had brought them with her. The witness explained that she had misunderstood the subpoena to produce the records in court. The court thereupon sustained the objection to the question which had been put. There was an exception to the ruling and an offer to prove that if permitted to answer, the witness's reply would be "No". The same objection was made to the offer and sustained. In making its ruling the court said:

"The Court: It will be considered as restated. The court sustains the objection to the offer. It appears to me that we have not a complete record, and not having it, I don't know any theory on which one could say it does or does not contain certain things. The witness testified she only has a part of the record. It appears to me that they are not signed, no signature at all; no signature of the president and no signature of the secretary, and the law of Montana requires the name of each.

"Mr. Brown: If the Court please on that matter, I would request a continuance until probably tomorrow afternoon. We subpoenaed Mrs. Symonds and requested her to bring the original records. She had this book and she believed that is what she was doing. She has the other books in Miles City and they can be produced here. It is just a mistake. She copied from them into this book and filed the others in Miles City. This was the book she acted on and she produced it here. It is a mistake, but I don't think anyone is to blame for it.

"The Court: How long will it take to complete the case after the records are here?

"Mr. Brown: I think we can go ahead with some other testimony this afternoon, and we will telephone this evening.

"The Court: Very well, proceed along another line."

From the interrogatories of the court and the answers of the witness it appears that the court took the position that the best evidence of what meetings were held and what transpired at these meetings were the records themselves, and apparently counsel for appellant acquiesced in the ruling since additional time was requested in order to produce the complete records. Although the witness was recalled later with an additional minute book, there was no further offer to make proof of the matter in question. The necessary records were not submitted. There was no error here in the ruling of the trial court. In any event, had the offer been received the answer would not change the result as the court held that no meeting of stockholders was necessary to authorize the action of the officers of Glengarry. This conclusion of the trial court was also correct, as we later point out.

A further claim of error is made against the trial court's conclusion of law to the effect that had the agreement to convey and the deed of conveyance to appellee not been executed by Glengarry, nevertheless the evidence establishes such equities in favor of appellee as would result in a trust in his favor, which would require judgment for him in this suit. This conclusion, as stated by the court, recites:

"In the absence of the agreement between the plaintiff, Max Trunz, and the defendant Glengarry Mining Company, a corporation, * * * and the execution and delivery to the plaintiff, Max Trunz,

by the defendant Glengarry Mining Company, a corporation, of the Deed * * *, wherein and whereby it conveyed to him all of the right, title and interest of [Glengarry], in and to the mining premises involved in this action, a trust would be presumed to result in favor of the plaintiff, Max Trunz;

"Section 6785, Revised Codes of Montana, 1921 and 1935."

This section provides: "When a transfer of real property is made to one person, and the consideration thereof is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made." See, also, Humbird v. Arnet, 99 Mont. 499, 510, 44 P.2d 756.

■ Appellee acquired his rights to the mining claims on June 28, 1934. Appellant claims to deraign its title through an execution sale on a judgment against Glengarry not recovered until more than two years after the deeds vesting title in appellee had been placed of record. The District Court in its findings of fact determined that at the time the judgment of Crone was entered and at all times thereafter all the world had notice of each and all of the facts and circumstances concerning the deed from Glengarry to Trunz, and particularly that Crone, Birkel, and appellant had actual knowledge of each and all of the facts and actual notice of circumstances sufficient to put a prudent man upon inquiry as to each and all of said facts.

At the time Crone procured this judgment Glengarry had no title to the mining claims and no interest therein was acquired by the execution sale. In the case of MacGinniss Realty Co. v. Hinderager, 63 Mont. 172, 206 P. 436, 439, the supreme court of Montana quotes the following language with approval:

" 'The purchaser at a sale of real property on execution acquires all the right, title, interest and claim of the judgment debtor therein; * * * but he acquires only such right and interest, and he takes the property subject to all the rights and equities of third parties which are capable of being enforced against the judgment debtor. "The rule of caveat emptor applies to execution sales." ' "

Later the supreme court of Montana in Sherlock v. Vinson, 90 Mont. 235, 1 P.2d 71, 72, again reiterates the rule:

"The rule of caveat emptor applies to execution sales. The purchaser at a sale of real property on execution acquires all of the right, title, interest, and claim of the judgment debtor therein and no more. * * *"

Appellant here has asserted no rights, either as a stockholder of Glengarry, for itself as such, or on behalf of other stockholders.

It is not without significance, perhaps, that after the Glengarry Mining Company was made a party defendant to this suit it never appeared, and its default was duly entered.

### Appellant's Principal Contention

We now discuss the principal contention made by appellant. It maintains that the deed, which was signed "Glengarry Mining Company, By Martin R. Guenzel, Its President, L. K. Symonds, Its Asst. Secretary," which was delivered to the appellee and recorded, was never authorized by the stockholders of the corporation or by its directors, and that it is without effect for failure to comply with Section 6004 of the Revised Codes of Montana, 1935. The same objection is urged against the agreement which preceded the execution of this deed, and which was the basis for the payment of $25,000 by Trunz to Branser. On the other hand, appellee maintains, and the court below found, that the officers of Glengarry Mining Company in executing the challenged instruments, which had their origin in the stipulation hereinbefore referred to, which admittedly was entered into by the authority of the corporation, did so to avoid the effect of a forfeiture of the Branser option by securing from Trunz an additional period of time within which to procure a new option and thereby effectuate the purpose covered by the stipulation with Branser, which, as has been stated, was entered into with full authority of Glengarry. Furthermore, at a meeting of the stockholders of Glengarry, held on December 3, 1934, after all these agreements had been made and entered into, the stockholders adopted the following resolution: "Resolved that the stockholders present at this meeting approve the action of the Officers and Directors of this Corporation for the last year."

Upon this branch of the case the District Court found:

"In doing all of the things he is hereinbefore stated and shown to have done

Martin R. Guenzel was acting in the course of his employment as the President of the defendant Glengarry Mining Company, a corporation, and for and on its behalf, in connection with obligations and contracts essential to its ordinary affairs and for the purposes of the corporation;"

■ The pertinent parts of Section 6004, Rev.Codes of Montana, 1935, are printed in the margin.[1]

A careful reading of this lengthy section at once suggests that it was not intended thereby to restrict the powers of the officers and directors of a corporation in prosecuting the business of the corporation with respect to transactions incident to the ordinary activities of the corporation and which are calculated to further its continuance in business. This is made clear from a clause embodied in the very act itself, which reads: "provided, that nothing contained in this act shall be deemed to limit or restrict the powers of the board of directors or trustees of such

[1] "Procedure for sale, lease, etc., of corporate property. The board of directors or trustees of any stock corporation heretofore or hereafter organized under the laws of the territory or state of Montana, whether formed and existing before or after the taking effect of the Codes on July 1, 1895, whether solvent or insolvent, whether a going concern or otherwise, including mining corporations, shall have power, and upon request of stockholders representing at least one-half (½) of the capital stock outstanding and of record on the books of the corporation, and entitled, under the articles of incorporation, or amendments thereto, and the laws and constitution of Montana, to vote at the meeting hereinafter provided for, it shall be their duty to call by resolution a meeting of the stockholders of such corporation, appearing as such upon its books, and entitled to vote at such meeting, as aforesaid, for the purpose of considering the question of selling, leasing, mortgaging, exchanging, or otherwise disposing of the whole or any part of the property and assets of every kind and description of such corporation, for property, or for the whole or part of the capital stock of any other corporation, whether domestic or foreign, or otherwise. * * * The notice shall state the time, place, and the purpose of the meeting, and shall contain a complete and specific statement of the proposal to be considered and acted upon at said meeting, including in all cases where only a part of the property of such corporation is affected, a general description of the property proposed to be sold, leased, mortgaged, exchanged, or otherwise disposed of. A similar notice shall also be published at least once a week for at least four (4) consecutive weeks preceding the day of said meeting, in some newspaper of general circulation published in the county wherein the principal place of business of such corporation is located, or if there is no newspaper published in said county, then in the nearest county thereto wherein a newspaper is published, and said publication shall be proven by affidavit of the publisher or clerk of such newspaper, filed with the secretary of such corporation. * * * Thereupon any proposition for the sale, lease, mortgaging, exchange, or other disposition of the whole or any part of the property and assets of every kind and description of such corporation, for property, or for the whole or part of the capital stock of any other corporation, whether domestic or foreign, or otherwise, may be considered and acted upon by said meeting, and if stockholders representing at least two-thirds (⅔) of the whole number of shares of the capital stock of said corporation then outstanding, and of record on the books of the corporation, and entitled, as aforesaid, to vote at such meeting, appearing at said meeting in person or by agents or proxies, as above provided, vote in favor of any such proposition, whether proposed by the directors or trustees, or not, as said stockholders may see fit, which proposition shall be in the form of a resolution specifying the particulars thereof and entered on the minutes of said stockholders' meeting, the said proposition or resolution shall be taken and adopted as the act of the corporation, and shall be carried out as such, and shall be approved and adopted by the board of directors or trustees; * * * upon the adoption and approval by the board of directors or trustees of the corporation of such proposition or resolution, the corporation and its officers shall have full power and authority to do all acts and to execute all conveyances or other instruments in writing which are necessary or proper to carry out the said proposition or resolution, and the sale, lease, mortgage, exchange, or other conveyance of the whole or any part of the property of said corporation, authorized by said proposition or resolution, shall thereupon take effect and have the same force as if all the stockholders of the corporation had consented thereto; *provided, that nothing contained in this act shall be deemed to limit or restrict the powers of the board of directors or trustees of such corporation in relation to the disposition of property or the conduct of business;* * * *." (Emphasis supplied.)

corporation in relation to the disposition of property or the conduct of business;"

Appellant relies strongly upon the case of Hanrahan v. Andersen, 108 Mont. 218, 90 P.2d 494, 500. The facts upon which that case was decided were almost the reverse of those in the instant case. There the party who sought to sustain the instruments in question, which vested title in him, assumed that the transactions involved required the authorization of the stockholders as provided in Section 6004, Rev.Codes of Montana, 1935, upon the theory, no doubt, that the action which was taken would be beyond the powers of the officers "because not in the furtherance and in the ordinary course of the corporation's established business." It is also apparent from the record in that case that the transactions involved virtually all of the corporate assets and greatly affected the established corporate business, and therefore came well within that class of transactions necessitating compliance with the statute. Accordingly, there was a pretense to comply with the law. However, purposely perhaps, the required notice of stockholders' meeting was not given, as the statute provided. In any event, the court in its decision disposed of the contention in the following language:

"The conveyance to Consolidated was a nullity, for the stockholders' meetings purporting to authorize it were held on insufficient notice. Whether the other defects indicated in those proceedings were material need not be considered." At page 500 of 90 P.2d.

It is interesting to note that in Hanrahan v. Andersen, supra, the purpose of the statute, and of the law as it existed before its enactment, is commented upon as follows (at pages 499, 500 of 90 P.2d):

"It has been held that the directors, unless specially empowered, could not sell any portion of the estate of the corporation essentially necessary for the transaction of its customary business. 2 Thompson on Corporations, secs. 1289, 1290; Rollins v. Clay, 33 Me. 132. The reason for the rule is that the purpose of a solvent corporation and of its stockholders is not to be defeated in whole or in part by the directors, nor even by the stockholders without unanimous consent, unless expressly provided by law. Forrester v. Boston & Montana Con. C. & S. Min. Co., 21 Mont. 544, 55 P. 229 [233], 353. It was to relax the rule in the latter respect so as to prevent a small minority from thwarting the will of the over-whelming majority that the statute now appearing as section 6004, supra, was enacted; and to make the relaxation of the law effective, its requirements must be essentially complied with. Wortman v. Luna Park Amusement Co., 61 Mont. 89, 201 P. 570."

The Wortman case, cited in the quotation above, furnishes additional support for the position of appellee here. The decision refers to Section 3897, Rev.Codes of Montana, in effect in 1921, which section was revised and reenacted as Section 6004, Rev. Codes of Montana of 1921 and 1935. The opinion reiterates (at page 571 of 201 P.) that the section was enacted "as a curative measure to obviate what appeared to be patent incongruities in the then existing law, and to prevent small minority stockholders from thwarting the will of the majority in making a sale otherwise valid under common law and for the best interest of the corporation." The statute does not apply to the situation now before the court.

It has long been the law in Montana that the president of a corporation possesses to some extent greater authority than the ordinary director. The rule is discussed in Mayger v. St. Louis Mining & Milling Co. of Montana, 68 Mont. 492, 219 P. 1102. In that case the question was as to the authority of the vice-president to acknowledge an indebtedness due from the corporation. The supreme court said (at page 1104 of 219 P.):

"This court never followed the ancient rule that the president of a corporation has no greater power than any other director. On the contrary, long ago it adopted the more modern, and what Mr. Fletcher (3 Fletcher's Cyclopedia Private Corporations, § 2011) calls—'the sensible rule, in accordance with the well-recognized ideas of the people at large, that a president of a corporation is the head of the corporation subject to the control of the board of directors as to matters out of the ordinary, but with power to bind the corporation in regard to contracts involved in the everyday business of the corporation.'"

It is evident from the facts stated, as found by the trial court, that Glengarry was not selling the mining claims to anyone. What the officers were trying to accomplish by these dealings with appellee, as pointed out, was to secure an option to purchase the claims; in other words, they were trying to buy the claims, not sell them. The

company was a mining corporation, and acquiring claims for mining operations was one of the ordinary business purposes of Glengarry. Moreover, the authority to acquire these particular mining claims was expressly contained in the stipulation entered into in the case brought by Branser against Glengarry.

Appellant's argument rests upon the erroneous assumption that what the officers of Glengarry were doing was selling the mining claims to Trunz. This was not the situation here at all. Glengarry in fact never owned the claims. All it ever had was an option to purchase them from Branser upon terms that it could not meet, and which would expire in a very few days. In these circumstances these officers, acting for their corporation as faithful servants intent on saving their corporation from loss if possible, did what the ordinary prudent business man would do in carrying on the affairs of the corporation, and in this there was no evasion of the statute.

The District Court held that in executing the challenged instruments the officers of Glengarry were dealing with matters connected with the ordinary business affairs of the company and the agreement and deed were such as were usual, proper, and necessary in the ordinary prosecution of its business. The conclusion of the trial court is strongly supported by the opinion of the supreme court of Montana in Alley v. Butte & Western Mining Co., 77 Mont. 477, 492, 251 P. 517, 522, wherein it was said:

" * * * A corporation is a fictitious person and can act only through human instrumentality; its corporate power must be exercised and its business conducted by individuals, and, while those powers may be exercised by its board of directors (section 5933), organized by the election of a president, secretary, and treasurer (section 5938), it is obvious that the everyday affairs of the corporation cannot wait upon the periodical meetings of the board, but must be attended to by officers and agents either elected or appointed for that purpose. The officer on whom such responsibility naturally falls is the president, whose action, in the execution of written instruments, is generally attested by the secretary, who is the keeper of the seal. With the growth of business transacted through the instrumentality of corporations, the rule has been adopted that:

" 'Where the president of a corporation makes a contract within the ordinary scope of the business of the corporation, unless notice to the contrary is given, a person dealing with the president may proceed upon the assumption that the president has authority as agent to bind it.' Mathias v. White Sul. Springs Ass'n, 19 Mont. 359, 48 P. 624; Id., 17 Mont. 542, 43 P. 921."

The above case also quotes with approval the following apt language from the case of Trent v. Sherlock, 24 Mont. 255, 61 P. 650, 652:

"No principle of law is more clearly settled than that an agent to whom is intrusted by a corporation the management of its local affairs, whether such agent be designated as president, general manager, or superintendent, may bind his principal by contracts which are necessary, proper, or usual to be made in the ordinary prosecution of its business. Thomp.Corp. § 4850; [cases cited]. The fact that he occupies, by the consent of the board of directors, the position of such an agent, implies, without further proof, the authority to do anything which the corporation itself may do, so long as the act done pertains to the ordinary business of the company. * * * "

Finding no reversible error in the record, the decree of the trial court is affirmed.